## UNDERWRITERS NATIONAL ASSURANCE CO. v. NORTH CAROLINA LIFE & ACCIDENT & HEALTH INSURANCE GUARANTY ASSN. ET AL.

No. 80–1496.   Argued November 9, 1981—Decided March 24, 1982

692

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, BLACKMUN, REHNQUIST, and O'CONNOR, JJ., joined. WHITE, J., filed an opinion concurring in the judgment, in which POWELL and STEVENS, JJ., joined, *post*, p. 716.

*Theodore R. Boehm* argued the cause for petitioner. With him on the briefs was *Charles T. Richardson.*

*William S. Patterson* argued the cause for respondents. With him on the brief were *Rufus L. Edmisten*, Attorney General of North Carolina, *Richard L. Griffin*, Assistant Attorney General, *Charles D. Case*, and *Eugene Gressman.*

JUSTICE MARSHALL delivered the opinion of the Court.

In this case, the North Carolina Court of Appeals held that an Indiana court was without jurisdiction to adjudicate the rights of various parties in a $100,000 deposit held in trust by certain North Carolina officials. Because it found that the Indiana court did not have jurisdiction, the North Carolina court refused to recognize the Indiana court's prior ruling that all claims to the deposit were compromised, settled, and dismissed by the final order entered by that court during a

rehabilitation proceeding. We granted certiorari to decide whether, by refusing to treat the prior Indiana court judgment as res judicata, the North Carolina court has violated the Full Faith and Credit Clause of the Constitution and its implementing federal statute. 451 U. S. 982 (1981). For the reasons stated below, we reverse the decision of the North Carolina Court of Appeals.

## I

Petitioner Underwriters National Assurance Co. (Underwriters) is an Indiana stock insurance corporation specializing in life and disability insurance for certain high-income professional groups. In 1973 Underwriters was licensed to do business in 45 States, including North Carolina, and was administering over 50,000 policies. To qualify to do business in North Carolina, Underwriters was required to join respondent North Carolina Life and Accident and Health Insurance Guaranty Association (North Carolina Association), a state-created association of all foreign and domestic insurance companies operating in North Carolina. See Life and Accident and Health Insurance Guaranty Association Act, N. C. Gen. Stat. § 58–155.65 et seq. (1975) (Guaranty Act). Under the terms of the Guaranty Act, the North Carolina Association is ultimately responsible for fulfilling the policy obligations of any member that becomes insolvent or otherwise fails to honor its obligations to North Carolina policyholders. N. C. Gen. Stat. § 58–155.72(4) (Supp. 1981).

In June 1973, after determining that Underwriters' financial condition was questionable, the North Carolina Commissioner of Insurance informed Underwriters that it must post a $100,000 deposit "for the sole benefit of North Carolina policyholders," to continue to do business in that State. Shortly thereafter, Underwriters deposited with the State a $100,000 bond registered to the "Treasurer of the State of North Carolina in trust for the Underwriters National Assur-

ance Company and the State of North Carolina as their respective interests may appear under Article 20, Chapter 58–188.5 of the North Carolina General Statutes." See N. C. Gen. Stat. § 58–182 *et seq.* (1975) (Deposit Act).

The North Carolina Commissioner's fears about Underwriters' financial condition proved to be well founded. Approximately one year after Underwriters posted this bond, the Indiana Department of Insurance commenced rehabilitation proceedings against petitioner on the ground that its reserves were inadequate to meet its future policy obligations. By order dated August 5, 1974, the Superior Court for Marion County (Rehabilitation Court)[1] appointed the Indiana Commissioner of Insurance as Rehabilitator and directed him to "take possession of the business and assets of Underwriters . . . and conduct the business thereof and appoint such personnel as may be necessary to rehabilitate Underwriters." Notice of this action was sent to all state insurance commissioners, including respondent North Carolina Commissioner. The North Carolina Commissioner immediately informed the North Carolina Association that Underwriters was undergoing rehabilitation in Indiana, and that title to all assets of Underwriters had been transferred to the Indiana Rehabilitator.

Shortly after entering the order of rehabilitation, the Rehabilitation Court enjoined the commencement or prosecution of any suit against Underwriters or the Rehabilitator. This injunction stayed several policyholder actions that had been filed against Underwriters, and required that any person who desired to institute or to prosecute any such action

---

[1] The Indiana Rehabilitation Court is a court of general jurisdiction. In addition, the Rehabilitation Court is authorized by statute to oversee the actions of the Rehabilitator in formulating a plan of rehabilitation, to enter injunctions to prevent interference with either the Rehabilitator or the rehabilitation proceeding, and to enter the final order of rehabilitation. See Ind. Code § 27–1–4–1 *et seq.* (1976).

join the Indiana rehabilitation proceeding.[2] The plaintiffs in the stayed actions were subsequently given permission to intervene in the rehabilitation proceeding. In October 1975, the Rehabilitation Court certified a class consisting of all past and present policyholders, and appointed intervening plaintiffs from the stayed actions as class representatives.[3]

The Rehabilitation Court sent notice of the rehabilitation proceeding to all policyholders, informing them that the class had been certified, and that all members not requesting exclusion would be bound by the judgment of the Rehabilitation Court. The notice concluded by stating that "[t]he entire court file" was available to any class member.[4]

Over the next two and one-half years, the Rehabilitation Court supervised the efforts of the Rehabilitator and other interested parties to return Underwriters to a sound financial footing. After extensive negotiations between Underwriters, the class representatives, and other interested parties, the Rehabilitator submitted a Proposed Plan to the Rehabilitation Court in April 1976. In order to preserve the financial

---

[2] Three class actions and one individual lawsuit were stayed as a result of the Rehabilitation Court's order. *Schultz* v. *Underwriters National Assurance Co.*, Civ. Action No. 74 C 2550 (ND Ill.) (class action on behalf of all Illinois policyowners); *Honeycutt* v. *Underwriters National Assurance Co.*, Civ. Action No. 482–74–A (ED Va.) (class action on behalf of all Virginia policyowners); *Hall* v. *Underwriters National Assurance Co.*, Civ. Action No. 75–L–1589–NE (ND Ala.) (class action on behalf of all policyowners in Madison County, Ala.); *Meyer* v. *Guarantee Reserve Life Ins. Co.*, Cause No. 786–532 (Super. Ct. of King County, Wash.). These lawsuits alleged, *inter alia*, that Underwriters had fraudulently misled policyowners as to the financial condition of the company.

[3] The court certified the class under Indiana Trial Rule 23(B)(3). Indiana Trial Rules are identical to the Federal Rules of Civil Procedure with respect to class actions.

[4] The court file included a document listing Underwriters' assets. The North Carolina Association concedes that this document included the $100,000 deposit as a general asset of Underwriters. Brief for Respondents 11–12.

health of the company and to provide continuing coverage for policyholders, the Rehabilitator proposed that the Rehabilitation Court reform the policies to require increased premiums and reduced benefits.[5]  Of particular interest to this litigation, the Proposed Plan stated that Underwriters "[will have] no liability to any guaranty association which itself has obligations to [Underwriters'] policyowners."  Proposed Rehabilitation Plan, I(J), Exhibit Binder 79 (E. B.).  Part X(C) of the Proposed Plan further provided:

> "The guaranty associations in some states *may have obligations to [Underwriters'] policyowners as a result of the [Underwriters] rehabilitation proceeding.*  Moreover, to the extent such guaranty associations do have obligations, there is a possibility that those guaranty associations may seek to recover from [Underwriters] sums paid to [Underwriters'] policyowners.  *The Rehabilitation Plan should resolve [Underwriters'] contingent liability to any guaranty association* by determining that [Underwriters] has no further obligation or liability to any guaranty association."  *Id.*, at 89 (emphasis added).

By direction of the Rehabilitation Court, the Rehabilitator mailed a copy of this Proposed Plan to all interested parties, including all state guaranty associations and insurance commissioners.  The Rehabilitator subsequently sent to the guaranty associations notice of a hearing to consider various rehabilitation plans, including that of the Rehabilitator.

---

[5] Underwriters had underwritten a large block of "noncancelable" disability insurance policies.  These policies not only were guaranteed to be renewable at the same premium regardless of experience, but also entitled the policyowner to a refund of 80% of the premiums paid if no disability claims were asserted in a 10-year period.  The Proposed Plan eliminated the 80% refund, and converted the policies from "noncancelable" to "guaranteed renewable," meaning that the policy was renewable at the policyowner's option, but the company could increase the premium.

This notice explicitly informed the guaranty associations that although eight associations, including the North Carolina Association, "may have obligations to . . . policyowners as a result of the [Underwriters] rehabilitation proceeding," no association had either intervened in the proceeding, or made suggestions for changes in the Plan. The notice directed that if a guaranty association desired to present any information or contentions relevant to the rehabilitation of Underwriters, it must intervene in the proceeding and present its arguments at the June 9, 1976, hearing. Unless the associations either intervened, or stated in writing that they had no obligations to policyowners and that they waived all claims against Underwriters and the Rehabilitator, a summons would issue to bring the associations before the Rehabilitation Court. *Id.*, at 59–61.

On June 8, 1976, these eight guaranty associations, including the North Carolina Association, intervened in the Indiana rehabilitation proceeding. In their motion to intervene, the guaranty associations stated that Part X(C) of the Proposed Plan was "unacceptable," and that through negotiations, the associations and the Rehabilitator had agreed on a modification that would "protect the rights of the Guaranty Associations." In relevant part,[6] the guaranty associations proposed that Part X(C) be changed to read as follows:

"[Underwriters shall have] no further obligation or liability to any guaranty association other than the obligation to recognize as valid the assignment of the policyowner's rights to the guaranty association and to treat the guaranty association as it would have treated the policyowner; *provided, however*, if any guaranty association makes any payment to or on behalf of any policyowner which is not fully reimbursed pursuant to the foregoing

---

[6] The guaranty associations also requested that the court modify the plan in ways not relevant to the instant proceeding.

provisions, *that association shall receive from [Under-writers] each year until fully reimbursed a portion of [Underwriters'] statutory net gain from operations* after dividends to policyowners, federal income taxes and the payments to be made under Part XI equal to the annual premium in force for basic coverage in the state of that association on August 5, 1974, divided by the total annual premiums in force for basic coverage of [Underwriters] on August 5, 1974." *Id.,* at 105 (emphasis added).

After a full hearing in which the North Carolina Association participated, the Rehabilitation Court tentatively approved the Proposed Plan, including the above modification. The court directed the Rehabilitator to send notice to all interested persons that on October 14, 1976, a final hearing would be held on the Plan and the settlement of all claims against Underwriters. The notice sent by the Rehabilitator to Underwriters, the North Carolina Commissioner of Insurance, and all other interested parties specified that "[t]he Proposed Rehabilitation Plan provides in part XIII that upon [its] final approval . . . , all claims against [Underwriters] by policyowners or others are compromised and dismissed." At the request of the eight guaranty associations, the Rehabilitation Court subsequently approved a special mailing to policyholders in their respective States explaining that the guaranty associations were statutorily obligated under certain circumstances to continue to provide the benefits compromised by the Indiana court under the Rehabilitation Plan.

In November 1976, after holding final hearings in which the North Carolina Association participated, the Rehabilitation Court approved a Plan of Rehabilitation, which was, with respect to issues relevant here, identical to the Proposed Plan. In its order adopting this Plan, the Rehabilitation Court stated that it had "jurisdiction over the subject matter and over the parties, including . . . all [Underwriters]

policyowners [and] state insurance guaranty associations."
App. 38. Further, the court specified that "[t]o the extent
that any claim, objection or proposal which was or *could have
been* presented in this rehabilitation proceeding is inconsist-
ent with the Plan, that claim, objection or proposal is over-
ruled and relief to that extent denied." *Id.*, at 40 (emphasis
added). The court went on to state that "[t]his Order is final
as to all matters occurring prior to the date of this Order."
Finally, the Rehabilitation Court retained jurisdiction "to re-
solve all questions as to interpretation . . . of the Plan," and
"to modify . . . the Plan in any respect in the light of future
developments." *Id.*, at 42. Notice of the court's order
adopting the final plan was sent to all interested parties, in-
cluding all policyowners, state insurance commissioners, and
the eight guaranty associations. No appeal was taken from
this order, and Underwriters was released from rehabilita-
tion in February 1977.

On June 8, 1977, Underwriters and the eight guaranty as-
sociations, including the North Carolina Association, invoked
the Rehabilitation Court's continuing jurisdiction to request
that it approve a "Service Contract," under which Under-
writers would continue to service policyowners residing in
these States at pre-rehabilitation levels in return for a fee
paid by the associations. The Rehabilitation Court approved
the proposed contract and directed that Underwriters and
the associations execute this agreement "in substantially the
form" presented to the court.[7] Pursuant to this order, Un-
derwriters and seven of the guaranty associations executed
the Service Contract without incident. Before the North
Carolina Association executed its Service Contract, however,
it made an addition to the document previously presented to
the court. Specifically referring to Underwriters' $100,000

---

[7] At the joint request of Underwriters and the associations, the Rehabili-
tation Court had approved the concept of a service contract prior to the
adoption of the final Plan of Rehabilitation. Brief for Petitioner 11.

deposit in North Carolina for the first time since it had intervened in the rehabilitation proceeding 16 months before, the North Carolina Association added the following paragraph to the Service Contract approved by the court:

> "It is expressly agreed, however, that the Guaranty Association and Underwriters explicitly reserve all their rights and remedies in connection with any deposits made by Underwriters with the Commissioner of Insurance of North Carolina, including deposits understood to total One Hundred Thousand Dollars ($100,000.00), which rights and remedies are governed by North Carolina law." E. B. 34.

Underwriters signed the revised agreement, but it made clear in a cover letter accompanying the signed agreement its understanding that the above paragraph was intended only to preserve any *future* rights that the North Carolina Association may have in the $100,000 deposit. Any other interpretation of this paragraph, the letter concluded, would be unacceptable because the "Plan of Rehabilitation had the effect of shutting off rights that North Carolina citizens and/or the Guaranty Association might otherwise have had to the deposits" prior to rehabilitation. *Id.*, at 35.

The North Carolina Association responded to this letter by filing suit against Underwriters, the North Carolina Commissioner of Insurance, and the State Treasurer, in the Superior Court of Wake County, N. C. The complaint prayed for a declaratory judgment that the North Carolina Association was entitled to use the $100,000 deposit to fulfill the pre-rehabilitation contractual obligations to North Carolina policyowners that had been compromised in the rehabilitation proceeding. The North Carolina Commissioner and Treasurer filed a cross-claim against Underwriters, also requesting that the deposit be liquidated for the benefit of the North Carolina Association and North Carolina policyholders. Underwriters answered, asserting that the Indiana judgment

was res judicata as to any pre-rehabilitation claims against the deposit, and therefore was entitled to full faith and credit in the North Carolina courts.

Invoking the Rehabilitation Court's continuing jurisdiction to resolve all questions involving the interpretation of the Plan, Underwriters filed a petition for instructions in July 1978. The Rehabilitation Court granted the petition, and sent notice to the North Carolina Association, the North Carolina Commissioner and Treasurer, and to all other parties to the rehabilitation proceeding. On September 22, 1978, the Rehabilitation Court held a hearing, at which both Underwriters and the North Carolina Association appeared and presented their respective full-faith-and-credit claims. In an opinion dated November 22, 1978, the Rehabilitation Court held that the 1976 Rehabilitation Plan "fully adjudicated and determined that the North Carolina deposit was an asset of . . . Underwriters, and any claim existing as of the date of adoption of the Plan . . . was compromised, settled and dismissed by the final Order and the Plan." App. to Pet. for Cert. 38A. In reaching this conclusion, the Rehabilitation Court specifically noted that the North Carolina Association had never made any claim to the deposit, even though the $100,000 had been included, without objection, in the general assets of Underwriters listed in Part V of the Plan. See n. 4, *supra*. The court went on to state that, although it probably had the power to enjoin the North Carolina Association from proceeding in North Carolina, it declined to do so because it believed that the North Carolina state court would recognize its judgment as binding.[8]

After receiving the Rehabilitation Court's ruling, Underwriters moved for summary judgment in the North Carolina state trial court, as did the respondents, the North Carolina Association and the North Carolina officials. The trial court

---

[8] The North Carolina Association has appealed this ruling, but the Indiana Court of Appeals stayed consideration of its appeal pending this Court's resolution of this case.

entered summary judgment in favor of the respondents, reasoning that it was the only court with the "requisite subject matter jurisdiction to determine the rights of North Carolina policyholders in the special deposits made by [Underwriters] for their protection." App. to Pet. for Cert. 25A. While noting that the Indiana court did not have *in personam* jurisdiction over the North Carolina officials or over the North Carolina policyholders, the court held that "[a]n appearance in the Indiana insolvency proceeding by any of the parties having an interest in the deposit . . . could not constitute a waiver of the Indiana Court's lack of subject matter jurisdiction with regard to the deposit." *Ibid.* As a result, the North Carolina trial court refused to honor the judgment of the Rehabilitation Court. The trial court directed the Commissioner of Insurance to liquidate the deposit to reimburse the North Carolina Association for satisfying the pre-rehabilitation claims of North Carolina policyholders.

On appeal, the North Carolina Court of Appeals affirmed, substantially for the reasons expressed by the trial court. 48 N. C. App. 508, 269 S. E. 2d 688 (1980). The Court of Appeals emphasized that the North Carolina Association sought to protect "statutory," as opposed to "contractual," rights; that title and rights to the $100,000 were vested by law in the State Commissioner and Treasurer, thus depriving the Rehabilitation Court of subject matter jurisdiction over the deposit; and that the Rehabilitation Court did not have *in personam* jurisdiction over these officials. *Id.,* at 517, 269 S. E. 2d, at 694. The Court of Appeals concluded that the deposit could never be an asset of Underwriters, and that the Rehabilitation Court's decision to the contrary was not entitled to full faith and credit. The North Carolina Supreme Court declined to grant discretionary review. 301 N. C. 527, 273 S. E. 2d 453 (1980).

## II

The concept of full faith and credit is central to our system of jurisprudence. Ours is a union of States, each having its

own judicial system capable of adjudicating the rights and responsibilities of the parties brought before it. Given this structure, there is always a risk that two or more States will exercise their power over the same case or controversy, with the uncertainty, confusion, and delay that necessarily accompany relitigation of the same issue. See *Sherrer* v. *Sherrer*, 334 U. S. 343, 355 (1948); *Riley* v. *New York Trust Co.*, 315 U. S. 343, 348–349 (1942). Recognizing that this risk of relitigation inheres in our federal system, the Framers provided that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." U. S. Const., Art. IV, § 1. This Court has consistently recognized that, in order to fulfill this constitutional mandate, "the judgment of a state court should have the same credit, validity, and effect, in every other court of the United States, which it had in the state where it was pronounced." *Hampton* v. *McConnel*, 3 Wheat. 234, 235 (1818) (Marshall, C. J.); *Riley* v. *New York Trust Co.*, *supra*, at 353.[9]

To be sure, the structure of our Nation as a union of States, each possessing equal sovereign powers, dictates some basic limitations on the full-faith-and-credit principles enumerated above. Chief among these limitations is the caveat, consistently recognized by this Court, that "a judgment of a court in one State is conclusive upon the merits in a court in another State only if the court in the first State had power to pass on the merits—had jurisdiction, that is, to render the judgment." *Durfee* v. *Duke*, 375 U. S. 106, 110 (1963).[10]

---

[9] This construction is also compelled by 28 U. S. C. § 1738, the statutory codification of this constitutional guarantee. This provision requires that "Acts, records and judicial proceedings . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken."

[10] This limitation flows directly from the principles underlying the Full Faith and Credit Clause. It is axiomatic that a judgment must be supported by a proper showing of jurisdiction over the subject matter and over

Consequently, before a court is bound by the judgment rendered in another State, it may inquire into the jurisdictional basis of the foreign court's decree. If that court did not have jurisdiction over the subject matter or the relevant parties, full faith and credit need not be given. See *Nevada* v. *Hall,* 440 U. S. 410, 421 (1979).

The North Carolina courts relied on this limitation in refusing to give full faith and credit to either the 1976 judgment or the 1978 judgment of the Rehabilitation Court. Respondents argue, and the North Carolina courts held, that the Rehabilitation Court was powerless to determine that the North Carolina deposit was an asset of Underwriters. Specifically, respondents contend that the Rehabilitation Court lacked both jurisdiction over the subject matter and jurisdiction over the relevant parties.

A

The North Carolina courts held that the Guaranty Act and the Deposit Act deprived the Rehabilitation Court of the subject matter jurisdiction to determine rights in the $100,000 deposit. Regardless of the validity of this holding as a matter of North Carolina law,[11] it is not an appropriate ground for

the relevant parties. One State's refusal to enforce a judgment rendered in another State when the judgment is void for lack of jurisdiction merely gives to that judgment the same "credit, validity, and effect" that it would receive in a court of the rendering State.

[11] Respondents argue that because North Carolina courts have exclusive jurisdiction to determine rights in the deposit, they were not required to recognize the Indiana judgment. Even if we accept the argument that North Carolina courts have exclusive jurisdiction over the subject matter of this litigation, the rule of jurisdictional finality established in *Durfee* v. *Duke,* 375 U. S. 106 (1963), would still apply. See *infra,* at 706. Respondents attempt to analogize this claim of exclusive jurisdiction to the exclusive jurisdiction each State has to control the administration of real property within its borders. See *Fall* v. *Eastin,* 215 U. S. 1 (1909); *Clarke* v. *Clarke,* 178 U. S. 186 (1900). Respondents fail to recognize, however, that the *Durfee* Court explicitly refused to recognize an exception to the rule of jurisdictional finality for cases involving real property over which the State claims exclusive jurisdiction. 375 U. S., at 115.

refusing to accord the Indiana judgments full faith and credit under the facts of this case. In relying on this ground, the courts below failed to recognize the limited scope of review one court may conduct to determine whether a foreign court had jurisdiction to render a challenged judgment.[12]

This Court has long recognized that "[t]he principles of *res judicata* apply to questions of jurisdiction as well as to other issues." *American Surety Co.* v. *Baldwin*, 287 U. S. 156, 166 (1932). See also *Treinies* v. *Sunshine Mining Co.*, 308 U. S. 66, 78 (1939); *Davis* v. *Davis*, 305 U. S. 32 (1938). Any doubt about this proposition was definitively laid to rest in *Durfee* v. *Duke, supra*, at 111, where this Court held that "a judgment is entitled to full faith and credit—even as to questions of jurisdiction—when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment."[13] The North Carolina courts, therefore, should have determined in the first instance whether the Rehabilitation Court fully and fairly considered the question of subject matter jurisdiction over the North Carolina deposit,

---

[12] Respondents argue that the North Carolina court's determination of its own jurisdiction, as well as its determination that the Rehabilitation Court was without jurisdiction, is now entitled to this same limited scope of review. See Brief for Respondents 40. Although this argument would have force if Underwriters were collaterally attacking the North Carolina court's decision on jurisdiction, see *Treinies* v. *Sunshine Mining Co.*, 308 U. S. 66, 78 (1939), it has no application to this litigation: Underwriters is seeking direct review of the North Carolina court's judgment. Consequently, Underwriters need only argue that the North Carolina court erred in concluding that the Rehabilitation Court did not fully and fairly determine that it had jurisdiction to adjudicate rights in the deposit.

[13] The need for finality within our federal system, see *supra*, at 703–704, applies with equal force to questions of jurisdiction. As this Court stated in *Stoll* v. *Gottlieb*, 305 U. S. 165, 172 (1938): "After a party has his day in court, with opportunity to present his evidence and his view of the law, a collateral attack upon the decision as to jurisdiction there rendered merely retries the issue previously determined. There is no reason to expect that the second decision will be more satisfactory than the first."

with respect to pre-rehabilitation claims of the parties before it. If the matter was fully considered and finally determined in the rehabilitation proceedings, the judgment was entitled to full faith and credit in the North Carolina courts.

From our examination of the record, we have little difficulty concluding that the Rehabilitation Court fully and fairly considered whether it had subject matter jurisdiction to settle the pre-rehabilitation claims of the parties before it to the North Carolina deposit. As we noted earlier, in addition to being a state court of general jurisdiction, the Rehabilitation Court also has special duties with respect to the rehabilitation of insurance companies. See n. 1, *supra*. In its November 1976 order approving the Rehabilitation Plan, the Rehabilitation Court made it clear that it was asserting both subject matter jurisdiction over all pre-rehabilitation claims against Underwriters, including those of the guaranty associations, and personal jurisdiction over the North Carolina Association and Underwriters. See App. 39, 53. Furthermore, as our recitation of the events leading up to the Rehabilitation Court's 1976 order indicates, that court was aware of potential claims that the North Carolina Association might assert against Underwriters. In order to ensure that all such claims were definitively resolved during the rehabilitation proceeding, the Rehabilitation Court notified the Association that it *must* either intervene in the rehabilitation proceeding to make objections to, or suggest changes in, the Proposed Plan of Rehabilitation, or specifically waive all such claims. See *supra*, at 698. Finally, the record indicates that, after the North Carolina Association intervened in the rehabilitation proceeding, it negotiated certain changes in Part X(C) of the Proposed Plan of Rehabilitation, concerning Underwriters' liability to the guaranty associations for payments made to Underwriters' policyowners.[14] See *supra*, at 698–699.

---

[14] The North Carolina Association argues that Part X(C) of the Proposed Plan explicitly recognizes its right to assert pre-rehabilitation claims

The North Carolina Association relies on the failure of the Rehabilitation Court either to specify that it was extinguishing the Association's right to use the $100,000 deposit to satisfy pre-rehabilitation obligations, or to address the argument that only North Carolina courts have subject matter jurisdiction to settle rights to the deposit. This reliance is misplaced. First, any doubts that the North Carolina Association may have had concerning the extent to which the Rehabilitation Court purported to exercise its jurisdiction over the Association's rights to the deposit were definitively settled by that court's 1978 ruling. *Supra*, at 702. After considering the arguments now advanced by the North Carolina Association, the Rehabilitation Court ruled that its 1976 order had "fully adjudicated and determined that the North Carolina deposit was an asset of . . . Underwriters, and any claim existing as of the date of adoption of the Plan against the deposit by the North Carolina Association . . . was compromised, settled and dismissed by the final Order and the Plan." [15] App. to Pet. for Cert. 38A.

---

against Underwriters. In its 1978 order, however, the Rehabilitation Court held that the claims asserted by the North Carolina Association in the North Carolina litigation would violate the Plan. App. to Pet. for Cert. 38A. Whether or not this ruling is correct is a matter to be decided by the Indiana courts on direct review, not in the North Carolina courts or in this Court on collateral attack.

[15] Respondents argue that this 1978 order was not a *de novo* reexamination of the jurisdictional question, and therefore is of no independent significance. This argument misperceives the question addressed in the 1978 proceeding. In its 1976 order, the Rehabilitation Court retained jurisdiction over parties to the proceeding to resolve questions of interpretation, implementation, and application of the Plan. App. 42. The question whether the 1976 order included the North Carolina deposit as a general asset, thereby compromising any claim that the North Carolina Association might otherwise have had to the deposit, is clearly a question of interpretation and implementation of the Plan. The 1978 order specifying that the Rehabilitation Plan disposed of the North Carolina Association's prerehabilitation rights in the deposit is a binding judgment on the interpreta-

Second, it is undisputed that the Rehabilitation Court had listed the North Carolina deposit as a general asset of Underwriters to be included in the Plan of Rehabilitation.[16]   By listing the deposit as a general asset, the Rehabilitation Court announced its intention to assert jurisdiction over pre-rehabilitation claims to the deposit.[17]   As an intervening

tion of the Plan rendered by a court that had retained jurisdiction over the issue.   Although the North Carolina Association still may attack the 1978 order on direct appeal, see n. 8, *supra*, that order is entitled to full faith and credit in the North Carolina courts.   See 1B J. Moore & T. Currier, Moore's Federal Practice ¶ 0.416[3] (1980).

[16] Respondents argue that the deposit was incorrectly included as a general asset of Underwriters, rather than as a special asset reserved exclusively for the benefit of North Carolina policyowners.   The propriety of including the deposit as a general asset, however, is irrelevant to the question whether the deposit was brought to the attention of the Rehabilitation Court.   As we have consistently held, the fact that the rendering court may have made an error of law with respect to a particular question does not deprive its decision of the right to full faith and credit, so long as that court fully and fairly considered its jurisdiction to adjudicate the issue.   See *American Express Co.* v. *Mullins*, 212 U. S. 311 (1909).   If the North Carolina Association wished to argue that the Rehabilitation Court should not have included the deposit as a general asset, and consequently should have declined to exercise jurisdiction over the deposit, it should have done so in the rehabilitation proceeding.   Having failed to do so, its only recourse is to assert these legal arguments on direct review before the Indiana courts; it cannot raise these contentions in a collateral attack on the judgment.

[17] The document listing the North Carolina deposit as a general asset of Underwriters was called to the North Carolina Association's attention by the North Carolina Commissioner of Insurance as early as March 11, 1975.   See E. B. 26.   The Association argues that it was misled into believing that the deposit was not before the Rehabilitation Court because the deposit had been listed as a general asset of Underwriters, and not as a deposit held in trust for the sole benefit of North Carolina policyowners.   However, the very fact that the $100,000 may have been erroneously included as a general asset subject to rehabilitation should have alerted the Association that the Indiana court was purporting to exercise jurisdiction over the deposit, and that, once a final plan of rehabilitation was approved, the Association's claim to use the North Carolina deposit to satisfy pre-

party to the rehabilitation proceeding, the North Carolina Association was obliged to advance its argument that the Rehabilitation Court did not have the authority to settle pre-rehabilitation claims to the deposit when it was given the opportunity to do so. A party cannot escape the requirements of full faith and credit and res judicata by asserting its own failure to raise matters clearly within the scope of a prior proceeding. See *Sherrer* v. *Sherrer*, 334 U. S., at 352. The Indiana Rehabilitation Court gave the North Carolina Association sufficient notice that any pre-rehabilitation claim that it had against the North Carolina deposit, including its argument that the Rehabilitation Court was without jurisdiction to extinguish its claim to the deposit, had to be advanced in the rehabilitation proceeding. No such claim having been made, the Rehabilitation Court finally determined the issue when it approved the Plan, and ruled that all claims inconsistent with the Plan,[18] which could have been presented in the rehabilitation proceeding, were "overruled and relief to that extent denied." App. 40. The issue having been fully and fairly considered by the Indiana court, its final determination was entitled to full faith and credit in North Carolina.[19]

---

rehabilitation obligations might be extinguished. Therefore, the North Carolina Association was obliged to object to this listing, which it believed to be erroneous, or to suffer the consequences.

[18] The North Carolina Association's claim to the deposit is "inconsistent with the plan" because the deposit was included as a general asset of Underwriters, and therefore was included in the pool of resources upon which continued coverage to all policyowners was based.

[19] The concurrence argues that the foregoing discussion of the Rehabilitation Court's assertion of jurisdiction over the deposit is unnecessary to the disposition of this case once it has been established that the court had personal jurisdiction over Underwriters and the North Carolina Association. See *post*, at 718. This argument misperceives both the nature of the jurisdiction asserted by the Rehabilitation Court and the North Carolina Association's challenge to that assertion of jurisdiction. Respondents do not dispute that the Rehabilitation Court had jurisdiction to settle

## B

Alternatively, respondents argue that the judgment of the Rehabilitation Court was not entitled to full faith and credit because that court lacked *in personam* jurisdiction over the North Carolina policyowners and the state officials. Although under different circumstances these questions might give us pause, it is clear that the Rehabilitation Court had personal jurisdiction over all parties necessary to its determination that the North Carolina Association could not satisfy pre-rehabilitation claims out of the North Carolina deposit.

---

all claims of the parties before it to the assets of Underwriters as part of its attempt to rehabilitate the company. They argue that the Rehabilitation Court's final resolution of claims against *Underwriters* does not preclude their action in North Carolina, however, because the North Carolina deposit *is not an asset of Underwriters*. Consequently, cases such as *Riehle* v. *Margolies*, 279 U. S. 218 (1929), and *Morris* v. *Jones*, 329 U. S. 545 (1947), are inapposite to the present situation. In those cases, as the concurrence correctly notes, this Court held that a court need not have jurisdiction over a debtor's property to determine whether a creditor had a legitimate claim against the debtor so long as it had personal jurisdiction over the creditor and the debtor. Those decisions do not hold, however, that a court with personal jurisdiction over the debtor and the creditor can adjudicate the creditor's claim against property *not belonging to the debtor*.

Given the nature of the North Carolina Association's claim, the Rehabilitation Court's 1976 order must be given full faith and credit in the North Carolina courts so as to bar the Association's claims only if the Rehabilitation Court determined, rightly or wrongly, that the $100,000 deposit *was* an asset of Underwriters, and that it therefore had the power to compromise the pre-rehabilitation claims of the parties before it to that asset. As we indicate in text, this was precisely the reasoning used by the Rehabilitation Court in 1978 when it held that the 1976 Plan had compromised the North Carolina Association's claim to the deposit. The only basis asserted by the Rehabilitation Court, which had specifically retained jurisdiction to resolve all questions of interpretation of the Plan, for barring the North Carolina Association from proceeding against the deposit was that the Plan "fully adjudicated and determined that the North Carolina deposit *was an asset of . . . Underwriters.*" App. to Pet. for Cert. 38A (emphasis added).

Respondents argue that the Rehabilitation Court did not have jurisdiction over the policyowners because no policyowner actually appeared in the rehabilitation proceeding, and because the class representatives could not adequately represent the interests of policyowners in both deposit and nondeposit States.[20] As a preliminary matter, we note that no North Carolina policyowner has complained about the Rehabilitation Plan, nor did any policyowner directly participate in either the North Carolina litigation or the proceedings before this Court.[21] Furthermore, the North Carolina Association has not identified *any* interest in the North Carolina deposit that a policyowner might have, independent of the interests asserted here by the Association. The class representatives in the rehabilitation proceeding were instructed by the Rehabilitation Court to represent the interests of all past and present policyowners. See n. 20, *supra.* Although the North Carolina Association asserts that these representatives were inadequate, it never explains *why* the policyowners, as compared to the Association, would care whether the deposit was considered a general asset of Underwriters, unavailable for the Association's use in satisfying pre-rehabilitation claims. North Carolina law requires the Association to provide North Carolina policyowners with pre-rehabilitation coverage even if it cannot use the deposit to finance this obligation. See N. C.

---

[20] The Rehabilitation Court sent the North Carolina policyowners notice that they were included in the class of policyowners in the rehabilitation proceeding. None of the North Carolina policyowners opted out of this class. In the rehabilitation proceeding, the interests of the policyowners were advocated by the class representatives.

[21] The North Carolina Association argues that the failure of the policyowners to appear in this litigation is not significant, because the Association is the legal representative of the policyowners, empowered to assert any claim that those policyowners might have against either Underwriters or the deposit. We accept this argument for purposes of this decision.

Gen. Stat. § 58–155.72(4) (Supp. 1981). Therefore, these policyowners have no current interest in whether the North Carolina Association is allowed to liquidate the $100,000 deposit. The North Carolina courts' refusal to give the Indiana judgment full faith and credit, accordingly, cannot be supported by the alleged inadequate representation of this unidentified policyowner interest.

The argument that the Rehabilitation Court did not have jurisdiction over the North Carolina officials is more complex.[22] The North Carolina Court of Appeals found that the Rehabilitation Court did not have jurisdiction over the trust property or over the statutory trustees. Citing this Court's decision in *Hanson* v. *Denckla*, 357 U. S. 235 (1958), respondents argue that absent jurisdiction over the trust corpus or the trustee, the Rehabilitation Court was powerless to adjudicate rights in the North Carolina deposit. Therefore, respondents argue, the judgment of the Rehabilitation Court is not entitled to full faith and credit, even as to parties admittedly subject to its jurisdiction.

Respondents' reliance on *Hanson* v. *Denckla, supra,* is misplaced. In *Hanson,* this Court considered both a Florida judgment on direct review, and a Delaware judgment refusing to accord full faith and credit to the Florida judgment. Because the Florida judgment was before the Court on direct review, the Court was free to determine whether that court's exercise of jurisdiction over the trust or the trustee was appropriate. This Court determined that the Florida courts were without jurisdiction over either the trust or the trustee

---

[22] The North Carolina Association argues that the State of North Carolina has intentionally made these North Carolina officials necessary but unreachable parties in order to ensure that its courts will have exclusive jurisdiction over all claims concerning rights in any North Carolina deposit. Underwriters contends that, if this is true, the North Carolina statutory scheme violates the Commerce Clause. Because of our resolution of this case, we find it unnecessary to reach this issue.

who, under Florida law, was a necessary party to a suit to determine the validity of the trust. As a result, of course the Delaware courts were under no obligation to accord full faith and credit to a judgment rendered in a court without jurisdiction.

In this case, however, the Rehabilitation Court's conclusion that it had jurisdiction to compromise the claims of the parties before it to the North Carolina deposit is not presented to this Court on direct review, and we express no opinion on the propriety of this conclusion. Although the Rehabilitation Court did not attempt to exercise jurisdiction over the North Carolina trustees, that court *did* purport to exercise jurisdiction over the trust corpus.[23] The 1978 order specifies that the 1976 Rehabilitation Plan determined that the North Carolina deposit was an asset of Underwriters, subject to the jurisdiction of the Rehabilitation Court. This conclusion may well have been erroneous as a matter of North Carolina law. See *State ex rel. Ingram* v. *Reserve Insurance Co.*, 303 N. C. 623, 629, 281 S. E. 2d 16, 20 (1981). Erroneous or not, however, this jurisdictional issue was fully and fairly litigated and finally determined by the Rehabilitation Court. Under *Durfee* v. *Duke*, 375 U. S. 106 (1963), and its progeny, once the Rehabilitation Court determined that the North Carolina Association could not liquidate the deposit to settle pre-rehabilitation claims, the North Carolina courts were required to honor that determination, even though the Rehabilitation Court did not assert personal juris-

---

[23] Because we find that the Rehabilitation Court did purport to exercise jurisdiction over the trust, we do not have to address respondents' argument that Indiana law, like the Florida law at issue in *Hanson* v. *Denckla*, 357 U. S. 235 (1958), requires jurisdiction over the trust or the trustee before rights in a statutory trust can be compromised. The concurrence, by arguing that personal jurisdiction over Underwriters and the North Carolina Association was sufficient to prevent the Association from litigating its claim to the deposit in North Carolina, seems to imply that *Hanson* is no longer dispositive on this point.

diction over the trustees. See *supra*, at 706–707. It is beyond dispute that a court of competent jurisdiction can settle the claims of two competing parties to specific property even though a third party may claim an interest in the same res. See *Morris* v. *Jones*, 329 U. S. 545 (1947). The Rehabilitation Court held that the Rehabilitation Plan extinguished the claim that the North Carolina Association is now asserting, and the North Carolina courts erred in refusing to give that court's judgment full faith and credit.

## C

Respondents argue that requiring North Carolina to give full faith and credit to the Rehabilitation Court's determination that the deposit was an asset of Underwriters, would negate that State's comprehensive statutory scheme to ensure the protection of North Carolina policyowners. Respondents contend that the courts and commentators are virtually unanimous in their support of a State's right to segregate assets of a foreign insurance company to be used for the sole benefit of that State's policyowners. See 2 G. Couch, Insurance Law § 22:96 (2d ed. 1959); 5 J. Joyce, Law of Insurance § 3595 (2d ed. 1918). Cf. *Blake* v. *McClung*, 172 U. S. 239, 257 (1898). It would not be equitable, respondents conclude, to require North Carolina to honor such a clearly erroneous result. While these arguments may have merit as a matter of insurance law, the only forums in which respondents may challenge the Rehabilitation Court's assertion of jurisdiction on these legal and equitable grounds are in Indiana.[24] The North Carolina Association's decision to assert these arguments in a separate proceeding in North Carolina has resulted in two state courts reaching mutually inconsistent judgments on the same issue. This is precisely the situation the Full Faith and Credit Clause was designed to prevent.

---

[24] Indeed, in the Indiana appellate court's review of the 1978 order, the North Carolina Association may still have an opportunity to challenge the Rehabilitation Court's conclusion that it had jurisdiction over the deposit.

Because we find that North Carolina was obligated to give full faith and credit to the judgment of the Rehabilitation Court, we reverse the decision of the North Carolina Court of Appeals and remand for further proceedings not inconsistent with this opinion.[25]

*It is so ordered.*

JUSTICE WHITE, with whom JUSTICES POWELL and STEVENS join, concurring in the judgment.

I agree with much of the discussion in the majority opinion on the scope and function of the principles of res judicata. I also agree with the majority that "it is clear that the Rehabilitation Court had personal jurisdiction over all parties necessary to its determination that the North Carolina Association could not satisfy pre-rehabilitation claims out of the North Carolina deposit." *Ante,* at 711.

The only parties over which the Indiana court needed jurisdiction in order to prohibit the Association from moving against the North Carolina deposit were the Association and Underwriters National Assurance Co. (UNAC). It had

---

[25] Underwriters urges us also to dismiss the cross-claim filed by the Commissioner of Insurance and the Treasurer of North Carolina because these state officials are mere "stakeholders" with no real interest in the deposit. Respondents reply that, as statutory trustees, these officials have a vital interest in the administration of deposits under their control. We have concluded that the North Carolina Association may not relitigate its claim to use the deposit to satisfy its obligations to North Carolina policyowners by arguing that the absence of the North Carolina officials deprived the Rehabilitation Court of jurisdiction. On the other hand, we recognize that, as a matter of state law, the North Carolina officials may have an interest in the deposit, independent of that asserted by the North Carolina Association, which was not considered by the Rehabilitation Court. In this Court, the respondent officials merely joined the arguments made by the North Carolina Association, and did not identify any independent claim that they might make against the deposit. Because this is purely a question of state law, on remand the North Carolina courts may determine whether, consistent with this opinion, these officials have any independent interest in the North Carolina deposit that was not determined in the Indiana proceeding.

jurisdiction over the latter in a rehabilitation proceeding, because Indiana was the State of incorporation; it had jurisdiction over the Association because, as the majority opinion amply demonstrates in Part I, the Association appeared before the court as a party and participated in the Rehabilitation Plan. With jurisdiction over UNAC and the Association, the Indiana court clearly had the authority to adjudicate the amount and character of the claim that the Association had against UNAC, including its claim against the North Carolina deposit.

This is true regardless of the jurisdiction the Indiana court may or may not have had over any other parties with potential interests in the controversial deposit. There are at least two such parties: the trustees and the North Carolina policyholders. In my view, the Indiana court did not have jurisdiction to determine the interests of either of these parties in the controverted fund. Neither of these parties appeared before the Indiana court, and I am quite unconvinced that the Indiana court had jurisdiction over the North Carolina deposit in the sense that it could adjudicate the validity of or scale down the lien on that fund held by nonappearing North Carolina policyholders and trustees. I agree with the majority, therefore, that it is proper for this Court to reserve at least the issue of whether the trustees "have an interest in the deposit, independent of that asserted by the North Carolina Association, which was not considered by the Rehabilitation Court." *Ante*, at 716, n. 25. As for the policyholders, as I understand the opinion of the North Carolina court, under North Carolina law the Association was subrogated to the rights of the policyholders when it entered the service contract and undertook to make the policyholders whole. The policyholders thus no longer have an independent interest in the deposit.* See 48 N. C. App. 508, 518, 269 S. E. 2d 688, 694 (1980).

---

*Since the policyholders and the Association appear to be the only possible beneficiaries of the trust, the trustees may have no beneficial interest to protect. This, however remains a matter of state law.

The authority of the Indiana court so to resolve the claims of the Association existed regardless of that court's jurisdiction over any particular asset of UNAC, including the North Carolina deposit. In *Riehle* v. *Margolies*, 279 U. S. 218 (1929), a creditor received a judgment against a corporation in state court. While the creditor's claim was being litigated in state court, a federal court appointed a receiver of the corporation's property. This Court held that the judgment from the state court regarding the creditor's claim had to be recognized as res judicata in the federal court, despite the fact that neither the corporation nor the receiver had undertaken to defend in the state court. The Court adopted a twofold distinction between control over claims and over assets:

> "In so far as [a court order] determines, or recognizes a prior determination of the existence and amount of the indebtedness of the defendant to the several creditors seeking to participate, it does not deal directly with any of the property. [This] function, which is spoken of as the liquidation of a claim, is strictly a proceeding *in personam*. . . . There is no inherent reason why the adjudication of the liability of the debtor *in personam* may not be had in some court other than that which has control of the *res*." *Id.*, at 224.

The reasoning of *Riehle* was specifically applied to judgments between States under the Full Faith and Credit Clause in *Morris* v. *Jones*, 329 U. S. 545, 549 (1947): "[T]he distribution of assets of a debtor among creditors ordinarily has a 'twofold aspect.' It deals 'directly with the property' when it fixes the time and manner of distribution. . . . But proof and allowance of claims are matters distinct from distribution." *Id.*, at 548–549. Thus, in my view, jurisdiction over the deposit is simply not relevant to the question of the res judicata effect of the Indiana court's judgment as to the Association.

The Rehabilitation Plan fully determined the nature of the claim that the Association would have against UNAC and established the manner in which it could collect on those claims. *Ante*, at 698–700.   That decision must be given res judicata effect by the North Carolina court vis-à-vis the Association, unless the Indiana court failed to follow the procedural requirements of the Due Process Clause.   I believe those requirements were met in this case, and, therefore, I concur in the judgment of the Court reversing the decision below.