144 F.Supp.2d 1134 (2001)
Sandra SHIFRIN, Plaintiff,
v.
GROUP HEALTH PLAN, INC. and Retiree Health Care Program For McDonnell Douglas Retirees, Defendants.
No. 4:01CV735SNL.
United States District Court, E.D. Missouri, Eastern Division.
May 23, 2001.
*1135 S. Sheldon Weinhaus, Weinhaus and Dobson, St. Louis, MO, for Sandra Shifrin, plaintiffs.
David A. Boresi, Thomas M. Dee, Markus P. Cicka, Melissa Z. Baris, Husch and Eppenberger, St. Louis, MO, for Group Health Plan, Inc., a division of  Coventry Health and Life Insurance Company, Retiree Health Care Program for McDonnell Douglas Retirees, defendants.

MEMORANDUM AND ORDER
LIMBAUGH, Senior District Judge.
Plaintiff originally filed her cause of action in the Circuit Court of St. Louis County seeking specific performance under an insurance policy. Specifically, she sought approval of benefits for particular ovarian cancer treatment program; i.e. high dose chemotherapy with stem cell transplantation at the M.D. Anderson Cancer Center in Houston, Texas. Plaintiff sought a TRO directing the defendants to pay for said treatment pursuant to the Retiree Health Care Program for McDonnell Douglas Retirees of which she is a beneficiary.[1] On the same day that the state court granted plaintiff a TRO, defendant Group Health Plan (GHP) removed the case to federal court on the basis of ERISA preemption.[2]
Upon removal of the case to federal court and its assignment to this Court, *1136 plaintiff filed a motion to remand challenging this Court's jurisdiction (# 7); i.e. asserting that the subject employees' health benefits plan is not an ERISA plan. Defendant GHP filed a motion for order to set aside the state court TRO (# 11). Plaintiff responded with a Rule 65 Fed. R.Civ.P. motion to continue, renew or reissue the TRO, or in the alternative, for a preliminary injunction (# 12). On May 21, 2001 the Court met with counsel (including counsel for the Plan who had yet to be served), to briefly hear argument regarding the TRO matter and to provide counsel with additional time to file any supplemental pleadings. Such pleadings have now been filed and the Court is ready to make its determination regarding the issues raised.
Although plaintiff is challenging this Court's jurisdiction, she contends that the Court may "assume" jurisdiction in order to grant injunctive relief pending a final decision on the jurisdictional issue. She cites the case of United States v. United Mine Workers of America, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947) in support of her position. The Court has carefully reviewed this case and finds that it is limited to its facts and not applicable in the present situation.
In United Mine Workers, supra, the federal government had seized and was operating a majority of the coal mines pursuant to the War Labor Disputes Act.[3] The terms and conditions of the employment of the mine workers was set forth in an agreement reached between Secretary of the Interior Krug and John L. Lewis, President of the United Mine Workers of America (the Krug-Lewis Agreement). The Krug-Lewis Agreement embodied most of the terms and conditions of the existing collective bargaining agreement between the mine workers and mine owners; i.e. the National Bituminous Coal Wage Agreement of April 11, 1945 (the Coal Wage Agreement). On October 21, 1946 Lewis sent a notice to Secretary Krug asserting a provision of the Coal Wage Agreement which provided that either party to the agreement could request a negotiation conference regarding the terms and conditions of employment for the mine workers. This same provision (§ 15) provided for written notice, subsequent to such a conference, by either party to the agreement of the termination of the agreement. United Mine Workers, 67 S.Ct at 680-81. Although agreeing to a conference, Secretary Krug specifically denied that provision § 15 of the Coal Wage Agreement was embodied in the Krug-Lewis Agreement.
Conferences were scheduled and began on November 1, 1946. On November 15, 1946 Lewis notified Krug that the United Mine Workers of America was exercising its option to terminate the Krug-Lewis Agreement as of midnight, November 20, 1946.
Secretary Lewis notified Lewis that he had no power either under the Krug-Lewis Agreement or federal law to terminate the contract by unilateral declaration. Lewis ignored this admonition and circulated his November 15th letter among the membership of the union.
On November 18, 1946 the Government filed a declaratory action seeking judgment that the United Mine Workers of America had no power to unilaterally terminate the contract. Alleging that the November 15th letter was in reality a strike notice, the Government sought a temporary restraining order and preliminary injunctive relief. United Mine Workers, 67 S.Ct. at 681-83. The district court *1137 immediately (and without notice) issued a TRO restraining Lewis and union officials from encouraging the mine workers to "interfere with the operation of the mines by strike or cessation of work". The TRO was in effect until November 27, 1946 at which time a preliminary injunction hearing was scheduled.
Despite the TRO, the mine workers proceeded with a work slow-down which became a full-blown strike on November 20, 1946. The strike shutdown completely those mines furnishing the major part of the country's bituminous coal production. On November 21, 1946 the Government sought to have the defendants held in contempt for willfully violating the TRO. The Court ordered defendants to cease the strike by November 25; otherwise, they would be tried on the contempt charge. On November 25, 1946 defendants responded by challenging the court's jurisdiction to issue the TRO. United Mine Workers, 67 S.Ct. at 683. Still challenging the court's jurisdiction, the case went to trial. The court extended the TRO, held a hearing on the jurisdictional matter, and found that its power to issue the TRO was not affected by either the Norris-LaGuardia Act or the Clayton Act. The court then proceeded to try the defendants on the contempt charge. On December 3, 1946 the court found the defendants guilty of both criminal and civil contempt. The court also entered a preliminary injunction, effective until a final determination of the case.
The defendants filed notices of appeal from the judgments of contempt. Pursuant to 28 U.S.C § 240(a), the Government filed for certiorari and the granting of same prior to judgment in the Circuit Court of Appeals. Due to "[p]rompt settlement of this case being in the public interest", the United States Supreme Court granted certiorari. United Mine Workers, 67 S.Ct. at 684-85.
In the Executive Order which directed the seizure of the mines, the President found that "the coal produced by such mines is required for the war effort and is indispensable for the continued operation of the national economy during the transition from war to peace; that the war effort will be unduly impeded or delayed by ____ interruptions (in production); and that the exercise ____ of the powers vested in me is necessary to insure the operation of such mines in the interest of the war effort and to preserve the national economic structure in the present emergency ____". United Mine Workers, 67 S.Ct. at 693-94. Upon review of the Executive Order, the Supreme Court stated that "[u]nder the conditions found by the President to exist, it would be difficult to conceive of a more vital and urgent function of the Government than the seizure and operation of the bituminous coal mines." Given the substance of the Executive Order, the Supreme Court held that the Norris-LaGuardia Act was inapplicable to the case.
Among other things, the Court reviewed the district court's power to issue the TRO. The Court noted that the power of the district court to issue the TRO depended in large part on the resolution of the jurisdictional question raised by the defendants as to the applicability of the Norris-LaGuardia Act. "In these circumstances, the District Court unquestionably had the power to issue a restraining order for the purpose of preserving existing conditions pending a decision upon its own jurisdiction." United Mine Workers, 67 S.Ct. at 694.
Based upon the case of United States v. Shipp, 203 U.S. 563, 27 S.Ct. 165, 51 L.Ed. 319 (1906), the Supreme Court found that a court has jurisdiction to determine its own jurisdiction, and has authority, "from the necessity of the case", to make orders to preserve the existing conditions and the *1138 subject of the petition. United Mine Workers, 67 S.Ct. at 695 quoting Shipp, 203 U.S. at 573, 27 S.Ct. 165.
It is clear that the "necessity of the case" was the "serious threat to orderly constitutional government, and to the economic and social welfare of the nation" that the strike notice presented. Maintaining the status quo was essential to the national security of this country. Enjoining the miners from striking would not be a detriment to any party involved; in fact the Court believed that the threat of a strike posed such a catastrophe of mammoth proportion that "we cannot ignore the effect of their action upon the rights of other citizens, or the effect of their action upon our system of government". United Mine Workers, 67 S.Ct. at 702.
This Court recognizes the serious nature of the plaintiff's medical condition and the need for prompt medical treatment (whatever that treatment may entail); however, her situation is strictly personal in nature and does not present the overwhelming threat to the security of the country and its citizens that was present in the United Mine Workers case. As difficult as it is for this Court to find, plaintiff's situation does not present such "necessity" as to require a TRO while this Court considers her challenge to its jurisdiction.
Furthermore, unlike the United Mine Workers case, a TRO in this case would not maintain the status quo. If the Court were to continue, renew or reissue the state court-ordered TRO, defendant GHP would be forced to expend a large sum of money which plaintiff's counsel concedes would not be capable of reimbursement if this Court should decide the case on the merits in favor of defendants. Moreover, once treatment is provided to plaintiff, the merits of the case become practically immaterial; i.e. once treatment is provided, plaintiff has won her case no matter the Court's ultimate decision. In Dennis Garberg & Associates v. Pack-Tech Int'l Corp., 115 F.3d 767 (10th Cir.1997), plaintiff Kansas company had filed a contract and negligence action against two Canadian companies regarding the manufacture of a product for the plaintiff using machines allegedly owned by plaintiff but in the possession of the defendants. While the defendants' challenge to the jurisdiction of the court in Kansas was pending, the Kansas court first issued a TRO prohibiting the defendants from disposing of the machines until the matter was settled. However, a few months later, the same court issued an order stating that it would, among other things, consider the defendants' motion to dismiss for lack of personal jurisdiction on condition that defendants deliver and reassemble the machines in Kansas by a date certain. The 10th Circuit Court of Appeals held that the district court had erred in issuing a mandatory injunction prior to determining its jurisdiction. The Court agreed that the district court had the jurisdiction to determine its jurisdiction; unlike the case of United Mine Workers, supra., the district court's order "went far beyond preserving the status quo... instead of preserving `existing conditions', dramatically altered them." Id., at 773-74. The Court found that the later order would have changed the location of the machines from Canada to Kansas and forced the defendants to deliver and reassemble the machines in Kansas at the defendants' own expense. "The performance commanded would have drastically altered the existing conditions, not preserved the status quo ante. Thus, plaintiff's reliance on I.B.M.[4] and United Mine Workers and similar cases is misplaced because the order in question here was not fashioned to preserve the existing *1139 conditions." Id., at 774. Such a situation exists in the present case. To enforce the TRO entered by the state court, prior to a determination of this Court's jurisdiction, would most certainly not preserve the status quo. Defendant GHP would expend a considerable amount of money and plaintiff would receive the treatment she seeks. Essentially, the Court would be granting full and complete relief prior to a hearing on the merits.
The Supreme Court has established that Article III jurisdiction is "always antecedent"; i.e. jurisdiction must be established as a threshold matter, for without it, a court cannot proceed at all in any cause. Steel Company v. Citizens for a Better Environment, 523 U.S. 83, 94-101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). In the present case, a non-frivolous challenge to jurisdiction has been lodged by the plaintiff. The Court concurs with defendant GHP's observation that the threshold question of ERISA jurisdiction is not only germane to the matter of determining subject matter jurisdiction, but is essential to the Court determining the standard by which to adjudge the merits of the plaintiff's complaint and request for relief. Under most circumstances, plaintiff's relief would be granted only after a review and application of the applicable standard. If this Court should decide that it has jurisdiction pursuant to ERISA preemption, granting plaintiff the relief she has requested via a TRO would totally circumvent the Court's adjudication of the applicable appropriate standard. Given that the plaintiff's ovarian cancer is presently in remission, the Court believes it is more prudent to decide the jurisdiction issue prior to fashioning any type of relief (assuming this Court were to have jurisdiction).
Finally, under the Full Faith and Credit Clause, the judgment of a state court should have the same credit, validity and effect in every other court in the United States that it had in the first court. However, a federal court does not have to give full faith and credit to a state court judgment if the state court did not have jurisdiction over the subject matter of the litigation or the parties. See, Underwriters National Assurance Company v. North Carolina Life and Accident and Health Insurance Guaranty Association, 455 U.S. 691, 704-05, 102 S.Ct. 1357, 71 L.Ed.2d 558 (1982); In the matter of Brady, Texas Municipal Gas Corp., 936 F.2d 212, 218 (5th Cir.1991).
Defendant GHP removed this case on the basis of ERISA preemption. Plaintiff has lodged a challenge to this Court's ERISA jurisdiction. Without deciding the matter, it appears that the plaintiff has a difficult job ahead of her in demonstrating that the subject group health plan is not an ERISA plan. If this Court were to enforce the state court-ordered TRO, then determine that the federal court has ERISA preemption jurisdiction, this Court would be in the position of giving full faith and credit to a state court judgment rendered by a state court that lacked jurisdiction over the subject of the litigation. The Court prefers not to find itself in such a predicament.
After careful consideration of the matter, the Court will stay both the defendant GHP's motion to set aside the TRO and the plaintiff's motion to continue, renew or reissue the TRO until such time the Court rules upon the pending motion to remand and decides the issue of jurisdiction. If this Court should deny the motion to remand, a hearing date on the plaintiff's request for injunctive relief will be set as soon as possible.
Accordingly,
IT IS HEREBY ORDERED that defendant GHP's motion to set aside TRO (# 11) be and is STAYED until such time *1140 the Court rules upon the pending motion to remand.
IT IS FINALLY ORDERED that plaintiff's motion to continue, renew or reissue the TRO (# 12) be and is STAYED until such time the Court rules upon the pending motion to remand.
NOTES
[1] Plaintiff also sought permanent injunctive relief, as well as damages for breach of insurance agreement and vexatious refusal to pay.
[2] As of May 11, 2001 (date of removal), defendant Retiree Health Care Program for McDonnell Douglas Retirees (the Plan) had not yet been served.
[3] The War Labor Disputes Act authorized the President of the United States to seize and operate the coal mines necessary for the war effort.
[4] United States v. I.B.M., 539 F.Supp. 473 (S.D.N.Y.1982).