**Dorothy Borden VICKERY, Appellant,**

v.

**Lida Adams Roberts GARRETSON, Appellee.**

**No. 85–1250.**

District of Columbia Court of Appeals.

Argued June 10, 1986.
Decided May 29, 1987.

judgment, unless the time is shortened or extended by order.

Howard L. Vickery, Washington, D.C., for appellant.

Samuel Shepard Jones, Jr., Washington, D.C., for appellee.

Before FERREN, TERRY, and ROGERS, Associate Judges.

FERREN, Associate Judge:

This case presents two questions: First, must the District of Columbia give full faith and credit to a Maine default judgment that decided an issue and awarded relief substantially different from both the

issue originally presented and the relief originally requested, without notice to defaulting parties? We conclude that the foreign judgment is not entitled to full faith and credit. Second, are the appellee's counterclaims for two alleged breaches of fiduciary duty that occurred during the 10–year course of the foreign proceedings barred by laches? We conclude that laches does bar one counterclaim, but, because the plaintiff in the foreign proceeding lulled the defaulting defendants into inaction, laches does not bar the second counterclaim. Accordingly, we reverse summary judgment for the plaintiff-appellee and remand for further proceedings.

## I.

Alice Hollister Lerch, a native and domiciliary of Washington, D.C., died in 1951. Lerch, an only child, never married or had children. At the time of her death, Lerch owned several acres of land near Phippsburg, Maine, improved in part by a summer cottage and a farm building. She also had personal property, primarily bonds and bank accounts, located in New York and in Washington, D.C. Lerch left a holographic will, dated July 13, 1949, which stated in relevant part:

I hereby appoint Lida Adams Roberts [Garretson] as executor of this my last will and testament, knowing that she will see that the provisions of this will are faithfully executed according to my wishes herein stated and as explained in conversation with her. . . .

I bequeath to said Lida Adams Roberts [Garretson], my cousin, all of my possessions of whatever nature, for her to distribute, and care for according to the following provisions.

It is my wish that my property located in the township of Phippsburg, State of Maine, consisting of land, housing and contents of houses, become a subsidiary of the estate called Adamsfort, situated in West Springfield, State of New Hampshire, now owned by my aunt Lida Hollister Adams (Mrs. Samuel S. Adams). The purpose of this subsidiary is to supplement the vacation home of Adamsfort, especially for the junior members of the

increasing family. It is my hope that this property may become a junior Adamsfort for joint ownership and pleasure managed in accordance with whatever plan is devised for the management of Adamsfort.

All of my money in banks, bonds and U.S. government bonds, with the exception of bequests specified below, is to be used for the care, maintenance and expenses of the above mentioned property in Maine.

If this property is not desired by the family for their joint use, it is not to be sold at any time but is to be deeded to the town [of] Phippsburg in perpetuity for a town community play ground for children and a clubhouse for adults, to be governed by the selectmen of the Town.

Since her parents had died before her, Lerch's only heir-at-law and next-of-kin was her aunt, Lida Hollister Adams, the mother of appellee, Lida Adams Roberts Garretson, and maternal grandmother of appellant, Dorothy Borden Vickery. Adams owned "Adamsfort," the Adams family's summer property located in West Springfield, New Hampshire. Adams died in 1958. Her will left her residuary estate in equal shares to her four children: Dorothy Adams Borden (appellant Vickery's mother), Mildred A. Downey, Lida Adams Roberts Garretson (appellee), and F. Dennette Adams. Dorothy Adams Borden and her husband (Vickery's parents) sold their interest in Adamsfort to the three other Adams children, including Garretson, in 1962. These three siblings sold Adamsfort to an unrelated third party in 1966.

Lerch's will was admitted to probate in the District of Columbia in 1951 and was admitted to ancillary probate in Maine in 1952. Garretson qualified as executrix. Although Garretson was never appointed a trustee, from 1952 to 1972 she acted as the trustee of a testamentary trust Lerch purportedly had created for the benefit of the Adams family. In November 1952, Garretson's attorney, Parker Jones wrote to Garretson, "You are now the Testamentary Trustee of all Miss Lerch's personal property. I assume the state of Maine will agree

that you hold title to the real estate under the same designation."

In December 1952, Jones wrote to Garretson's siblings that they were "beneficiar[ies] of the trust now being administered by Lida A. Roberts [Garretson] under the terms of the will of the late Alice H. Lerch." Also in December 1952, Jones met with Vickery and her sister to discuss the Maine property; Vickery was noncommittal about using the property. In January 1953, Vickery's mother, Dorothy Adams Borden, wrote to Jones that his "use of the term 'beneficiary' with respect to [her] relates only to such use as [she] may make of the place in Maine," that her daughters had a status identical to hers, and that neither she nor her daughters had indicated a desire to use the place in Maine and thus to avoid its distribution to the Town of Phippsburg. Borden never did use the property before she died in 1975. Jones, and apparently Garretson, continued nonetheless to regard Vickery as a beneficiary after her mother's letter. In 1960 and 1961, Jones suggested that Garretson invite Vickery to use the Maine property. Vickery does not recall ever having been to the Maine property, but since 1952 she had not been invited to use it except once to have drinks there.

In May 1972, Garretson brought an action in Maine to have the trust declared invalid for indefiniteness and uncertainty. The complaint requested distribution of the Maine property in fee simple to the estate of Lida Hollister Adams as Lerch's sole heir-at-law and next-of-kin under the intestate laws of Maine. Because Adams' will gave her property to her children, the Adams children would be successors-in-interest to the Maine property if the Maine

action succeeded. Thus, the relief originally sought in the Maine action would have had approximately the same effect as the purported trust: the Maine property would have been shared by the Adams family.[1]

The defendants in the Maine action were the nineteen individual members of the Adams family, none of whom was a resident of Maine, and the Town of Phippsburg, a contingent claimant. Garretson brought the action in her individual capacity and as executrix of the Lerch will. The court did not appoint a successor trustee or a trustee *ad litem*. All the individual defendants were served by certified mail. The complaint was accompanied by a terse cover letter from John Carey, Garretson's attorney,[2] and by a receipt card, which stated in its entirety:

> I acknowledge receipt of Summons and Complaint for Construction of Will in the above captioned matter sent to me by certified mail. I do not wish to file an appearance or file objections to the disposition to be made by the Court in this matter.

Vickery and most of the individual defendants signed and returned the cards to Carey, who apparently filed them with the court. The only opposition came from the Town of Phippsburg. Except for Tom Roberts (one of Garretson's sons), none of the individual defendants appeared in Maine to defend the action. Roberts entered an appearance but then did not appear to contest the action. Apparently for that reason, the court found Roberts in default. The court did not specifically find any other defendant in default.

On July 20, 1973, a year after the lawsuit was filed, Garretson wrote a letter to her siblings, including appellant's mother, de-

1. Under the trust theory, however, third generation Adamses, including Vickery, were beneficiaries. If, instead, the property passed to Lida Hollister Adams, and then to her children, third generation Adamses would have an interest in the property only to the extent that they inherited the interest from their parents, the second generation of Adamses. Since Dorothy Adams Borden, Vickery's mother, died leaving her residuary estate to her three daughters, Vickery's interest was approximately the same under either the trust theory or the theory that the

Maine property vested in Lida Hollister Adams, Vickery's grandmother.

2. Carey's cover letter stated in full:
    I am enclosing herewith Summons and copy of Complaint for Construction of Will by certified mail in connection with the above captioned matter.
    I am enclosing also a self-addressed card for mailing back to me, if the subject matter is according to your wishes.

scribing the lawsuit as a "friendly suit" brought to "eliminate the legal limbo still overshadowing [Lerch's] property under Maine trust law."

In anticipation that the Maine court will rule that the four of us are the legal heirs but, wishing to honor in a viable way Alice[ ] [Lerch's] desire to establish a trust, I am writing this letter now to ask if each of you would be willing to sign over your ¼ interest to me.... Thereafter I will create a trust for the Maine property set up in such a way that the family members named in the friendly suit who wish to contribute financially to the up-keep of the property may participate in its use.

A month later, on July 29, 1973, Garretson wrote her sister, Mildred Downey, that, given certain legal problems with the Lerch Trust, her lawyer had counselled her to ask the court to declare the trust invalid and to award the property to the four children of Lida Hollister Adams. "The point [of the suit] is to keep [the Maine property] in the family, devise an orderly transfer of responsibility and provide a sensible arrangement for its management and possible eventual disposal by sale." Garretson represented that her intention was to set up a new trust: "In any case, you may be sure that a trust will be designed to take into account everybody's interest in the continuing use of the place for family recreation as well as for equitable distribution of proceeds should a family consultation of the trust beneficiaries with other interested family members mentioned in the suit, conclude at some future time that disposal of the property by sale is the most prudent course of action." She concluded her letter by stating that Carey, her attorney, was "in effect, representing all of us in this matter vis-a-vis the court."

The case proceeded slowly, in part because Garretson's attorney, Carey, died in 1975. When new counsel took over in 1977 (five years after suit was filed), Garretson began to assert, for the first time, that she alone was entitled to ownership of the

Maine property. Garretson introduced a new theory: that the supposed trust provisions were merely precatory, not indefinite as she previously had asserted.[3] Garretson therefore claimed that she, alone, should inherit the property outright, free of trust, because Lerch had bequeathed the property to her with only an unenforceable wish concerning the Maine property. Other members of the Adams family, the putative trust beneficiaries, were not given notice of Garretson's personal claim to the Maine property, nor was the complaint amended to reflect this new personal claim.

On cross-motions for summary judgment by Garretson and the Town of Phippsburg (the only active parties in the case) and on their agreed statement of facts, filed in 1980, the Maine court entered judgment in August 1981, awarding Garretson the Maine property in fee simple. The court ruled that the will contained precatory language and therefore failed to create a trust as to the Maine property. The Maine court, however, failed to enter default judgments against the non-appearing defendant family members (with the exception of Tom Roberts, one of Garretson's sons).

On November 10, 1982, about a year after the Maine court had entered judgment and ten years after the Maine action had been initiated, Garretson brought a separate action in the District of Columbia which eventually gave rise to this appeal. She filed suit in Superior Court to gain legal control over the Washington, D.C. assets, free of trust. She alleged that because she was the owner of the Maine property by virtue of the Maine judgment, and because the Washington, D.C. assets were set aside for the benefit of the Maine property, she, as trustee, owned the entire beneficial interest of any trust holding the Washington, D.C. assets. Accordingly, she said, the legal and beneficial interests merged and thus she held the assets free of trust.

Service of the complaint in the Washington, D.C. action was appellant Vickery's

---

**3.** Garretson also argued at this stage, alternatively, that the will violated the rule against perpetuities, leaving only the provision that all of Lerch's possessions shall go to Garretson.

first notice that Garretson had asserted a personal claim to the Maine property, as well as Vickery's first notice of the Maine judgment. Vickery was the only named defendant to appear and contest the action in Washington. She promptly filed an answer and counterclaim denying Garretson was entitled to the Washington, D.C. assets and asserting Garretson had breached her fiduciary duty.

The trial court entered summary judgment for Garretson on August 15, 1985. The court ruled that (1) the Maine court had personal and *in rem* jurisdiction; therefore, the Maine judgment was entitled to full faith and credit; (2) the Washington, D.C. assets merged with the Maine property, the trust terminated, and Garretson held the assets free of trust; and (3) Vickery's counterclaim for breach of trust either failed because there was no trust (and hence no fiduciary duty to breach) or was barred by laches for her failure to assert her rights as a beneficiary for thirty-one years. This appeal followed.

## II.

■ Vickery contends the trial court erroneously gave full faith and credit to the Maine judgment. Under article IV of the United States Constitution, "the judgment of a state court should have the same credit, validity, and effect in every other court in the United States, which it had in the state where it was pronounced." *Hampton v. McConnel*, 16 U.S. (3 Wheat.) 234, 235, 4 L.Ed. 378 (1818). Full faith and credit is due, however, "only if the court in the first State had power to pass on the merits—had jurisdiction, that is, to render the judgment." *Durfee v. Duke*, 375 U.S. 106, 110, 84 S.Ct. 242, 244, 11 L.Ed.2d 186 (1963); *see also Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S.

691, 703–05, 102 S.Ct. 1357, 1365–66, 71 L.Ed.2d 558 (1982).[4] We must accord a foreign judgment only the same force and effect as would courts of the state from which it issued. *Durfee v. Duke*, 375 U.S. at 110, 84 S.Ct. at 244; *Underwriters*, 455 U.S. at 704 & n. 10, 102 S.Ct. at 1365 & 1366 n. 10. If, under Maine law, a judgment would be void and subject to collateral attack, then we shall not accord it full faith and credit. D.C. Code § 12–307 (1981); *see also O'Malley v. O'Malley*, 338 A.2d 149, 154 (Me.1975).

■ In determining whether the Maine court had jurisdiction to render the judgment at issue here, therefore, we turn both to Maine's own rules and case law on collateral attack and to Supreme Court decisions on the due process limits on jurisdiction. The two sources merge, however, because in Maine a judgment is subject to collateral attack if it evinces either a "denial of due process, lack of jurisdiction, or adjudication of issues beyond the scope of those submitted for decision." *Northeast Bank N.A. v. Crochere*, 438 A.2d 266, 268 (Me.1981) (citing *Warren v. Waterville Urban Renewal Auth.*, 290 A.2d 362, 365–66 (Me.1972)); *see also Land Use Regulation Comm'n v. Tuck*, 490 A.2d 649, 652 (Me. 1985).

■ Vickery argues that the Maine court lacked jurisdiction to award Garretson the Phippsburg and District of Columbia property and that its decision, therefore, deprived her of due process. Specifically, Vickery claims the Maine court granted relief qualitatively different from that requested in the complaint, and that she received no notice when Garretson drastically altered the nature of the suit she ostensibly had brought on behalf of the entire family. We agree. We may view Vickery and the other family members either as having received notice of the suit through the origi-

---

4. When a litigant asks a District of Columbia court not to give a state court decision the preclusive effect to which it is normally entitled, "the jurisdiction of the court which rendered judgment is always open to judicial inquiry." *Gilper v. Kiamesha Concord, Inc.*, 302 A.2d 740, 742 (D.C.1973). Had the Maine court itself fully and fairly adjudicated the question of its own

jurisdiction over the family members not present, we would be bound to give that determination full faith and credit. *See Underwriters*, 455 U.S. at 705–07, 102 S.Ct. at 1366–67; *Durfee v. Duke*, 375 U.S. at 111, 84 S.Ct. at 245. The Maine court, however, did not address that jurisdictional question.

nal complaint or as having received no notice of the suit ultimately adjudicated. In either case, the Maine court's decision constituted a default judgment against them. In awarding Garretson sole title to the property, however, the court adjudicated issues beyond the scope of those originally submitted for decision. Thus, the complaint did not constitute notice to the absent family members of the claim eventually adjudicated, and the judgment, therefore, deprived them of property without the notice required by due process. The Maine judgment, accordingly, was void and cannot be accorded full faith and credit.

## A.

Maine caselaw makes clear that it is "beyond the very power and authority of the court" to adjudicate an issue not submitted to the court for adjudication. *Warren,* 290 A.2d at 366. This rule becomes particularly important when a defendant who did not contest the suit will nevertheless be bound by the judgment. Thus, Me.R.Civ.P. 54(c) provides that "[a] judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment." It follows that when a court, by default judgment, "decide[s] an issue not raised by the pleadings and an issue not essential to the issues raised by the pleadings," *Norway Nat'l Bank v. Oates,* 297 A.2d 898, 903 (Me.1972), the judgment is a " 'mere nullity and open to collateral attack,' " *id.* at 902 (quoting *Buswell v. Wentworth,* 134 Me. 383, 391, 186 A. 803, 808 (1936) (citation omitted)); *see also* 2 R. Field, V. McKusick & L. Wroth, MAINE CIVIL PRACTICE § 54.4, at 9 (2d ed. 1970).[5] The justification for Rule 54(c) is that:

> [O]nce the defending party receives the original pleading he should be able to decide on the basis of the relief requested whether he wants to expend the time, effort, and money necessary to defend the action. It would be fundamentally unfair to have the complaint lead defendant to believe that only a certain type

and dimension of relief was being sought and then, should he attempt to limit the scope and size of the potential judgment against him by not appearing or otherwise defaulting, allow the court to give a different type of relief or a larger damage award.

10 C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2663, at 139–40 (1983) (discussing the identically-worded Fed.R.Civ.P. 54(c)) (footnote omitted).

■ The rule, then, is itself grounded in a defendant's due process right to participate in a court action adjudicating his or her rights to property, for "[t]his right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). The strictures of Rule 54(c) represent a particular example of the general due process right to be heard.

Garretson responds that the Maine order was not, in fact, a default judgment against the family members who did not appear. To show that the strictures of Rule 54(c) and *Norway Nat'l Bank* do not apply to the Maine adjudication, Garretson has three arguments. She contends that the order does not fall within the provisions of Me.R.Civ.P. 55(a), which governs defaults, because the defendants did in fact enter a pleading. She adds that, because the town of Phippsburg contested the action, there was plenary adjudication and, therefore, the judgment was not one of default. Finally, she argues that the Maine judgment was a judgment *in rem* determining title to land, not a default judgment against Vickery.

■ Me.R.Civ.P. 55(a) provides: "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by

---

**5.** A general request for such further relief as the nature of the case may require applies "only to those questions essential to the granting of relief specifically [requested]." *Norway Nat'l Bank,* 297 A.2d at 902.

these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter his [or her] default." None of the named individual defendants appeared except for Tom Roberts, against whom the court specifically entered a default judgment. Because they did not appear, the other family members did not plead or otherwise defend the law suit. It appears, therefore, that Rule 55(a) required the clerk to enter a default in the court docket against the absent family members. The summary judgment record does not expressly indicate that the Maine court did so.[6] Garretson, however, asserts that the waiver card amounted to a pleading that removed the case from the ambit of Rule 55 (a) & (c). We see no merit in this view of the matter, particularly since the signatories did not file the cards with the court; they returned the cards to Carey. The waiver cards might have served as a basis for Carey's request for a default, *see* Me.R. Civ.P. 55(a),[7] but they were not pleadings. Moreover, even if viewed as pleadings, the cards at the very most would constitute answers consenting to default judgments, for they only state: "I do not wish to file an appearance or objection."

■ Garretson also argues that a default judgment would not have been appropriate because, with the town challenging Garretson's suit, the court conducted plenary adjudication on the merits. This argument is specious. When there are multiple defendants, some of whom appear and contest while others do not, generally the court should enter default judgments against the absent defendants. 10 C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2690 (1983). More importantly, the rationale for applying the strictures of Rule 54(c) remains equally strong despite Phippsburg's role, since the city's interest in the property was

not only different from, but contrary to, the interests of the family members. That Phippsburg defended its claims to the property does not show the family defendants were not deprived of a voice when, after Garretson elicited their consent that she proceed without their opposition, she switched her case to one clearly in opposition to their interests.

■ We turn, finally, to Garretson's claim that default judgments would not have been appropriate under Me.R.Civ.P. 55(a), because the complaint did not request "affirmative relief" from the individual defendants; rather, Garretson argues, she sought a judgment *in rem* to determine title to land. We cannot accept this view of the suit. The court's order begins with the premise that "[t]he complaint seeks the construction of a will; specifically, the court is requested to interpret a trust provision and determine its legal validity." And, in fact, the court undertook to determine the claims of specifically identified persons: the family members who were known, *i.e.*, purported beneficiaries who were individually named in the original complaint either as plaintiff or defendants. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 6 comment a (1982). Garretson's suit was not in form against the property but against individual defendants. The action, therefore, cannot be classified as *in rem*. *See* 4 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 1070 (1969).

■ In any event, it makes little difference how one characterizes the basis of the Maine court's jurisdiction. We could not give full faith and credit even to a true *in rem* action against the Phippsburg property if Garretson had failed to notify the other family members of her suit. A claimant cannot relieve herself of the obligation to notify known interested parties simply by pleading *in rem* jurisdiction. Process

---

6. The Maine proceeding docket indicates:
   Nov. 13, 1974. On motion to default Mr. Thomas S. Roberts, *et als*, the court is in possession of a mailgram from Thomas Roberts to John P. Carey indicating that the said Thomas Roberts is interested in appearing to defend the above action. ORDERED that the said Thomas Roberts be and hereby is default-

ed unless within 20 days he makes his appearance in this court demanding that the default be stricken.
   Tom Roberts did not appear.

7. Carey apparently did file an affidavit of some sort on November 15, 1974, but the affidavit is not part of the record.

"calculated to give ... notice of the proceedings" to interested persons "cannot be dispensed with even in the case of judgments *in rem* ...." *Griffin v. Griffin,* 327 U.S. 220, 228, 66 S.Ct. 556, 560, 90 L.Ed. 635 (1946) (holding that absence of notice barred District of Columbia court from according full faith and credit to a New York court's alimony award); *see also Lewien v. Cohen,* 432 A.2d 800, 804–06 (Me.1981) (holding that judgment in a quiet title action was void because, based on plaintiff's representation, court erroneously had required only notice by publication rather than actual service on known claimants); RESTATEMENT (SECOND) OF JUDGMENTS § 6 comment a, at 74 (1982) (stating that "however the proceeding is categorized [as true *in rem* or *quasi in rem*], means reasonably certain to result in actual notice must be used as against persons to be bound by the proceeding if they can be identified and located"); Me.R.Civ.P. 4(f) (authorizing service by mail outside Maine "where the pleading demands a judgment ... affecting the title to any property") & 4(g) (permitting service by publication by order of the court "upon a showing that service cannot with due diligence be made" personally or by mail).

■■■■■ As we have noted, Rule 54(c) finds its source in a party's due process right to be heard in an action determining his or her rights. The essential point, then, is that the court's final order was, in effect, a default judgment against the putative trust beneficiaries, for they were named as defendants and their interests were known to the court, their rights were adjudicated,

and they had agreed to default at the plaintiff's request. We therefore conclude that, although default judgments apparently were not docketed against the non-appearing defendants, they should have been under Maine rules, and thus the family defendants were entitled to the right under Rule 54(c) to notice of the real character of the action in which they had chosen to acquiesce.[8]

## B.

■■■■ Garretson also maintains that, even if the Maine order was a default judgment, Vickery did receive adequate notice of the suit as finally litigated, for, according to Garretson, the court did not overstep the original complaint. The original complaint and waiver cards, she argues, fully satisfied the demands of Rule 54(c) and due process.[9] We disagree.

The original complaint in the Maine action, with which Vickery was served, requested the court to find the trust failed for indefiniteness and uncertainty and thus to award the property to the estate of Lida Hollister Adams, Lerch's sole heir-at-law. The only issue put to the court was, in its entirety:

> When a devise is made in terms manifesting an intention to establish a trust and the purported trust is not sufficiently definite or certain to be carried into effect, [in] who[m] would the legal title and any beneficial interest vest [ ]?

The complaint requested only the following relief:

---

8. The denial of due process was compounded by the fact that the Maine court failed to enter default judgments against the non-appearing parties. Maine has specifically recognized that failure to enter judgment against a defaulting defendant, even when the defendant signs a card waiving the right to appear and contest, deprives the judgment of finality and is neither enforceable nor appealable. *McGilvery v. McGilvery,* 152 Me. 93, 123 A.2d 777 (1956); *see also Tallwood Land & Development Co. v. Botka,* 296 A.2d 501 (Me.1972). Accordingly, under Maine law, the very failure to enter a default judgment against Vickery renders the judgment subject to collateral attack on that ground.

9. Garretson argues that Vickery is equitably estopped from collaterally attacking the judgment because she disavowed her claim to the property by returning the waiver card. *See, e.g., Dickerson v. Colgrove,* 100 U.S. (10 Otto) 578, 581, 25 L.Ed. 618 (1880); *Holsteen v. Thompson,* 169 N.W.2d 554 (Iowa 1969); *Roberts v. Friedell,* 218 Minn. 88, 15 N.W.2d 496 (1944); *Thom v. Thom,* 208 Minn. 461, 294 N.W. 461 (1940); 28 AM.JUR.2d *Estoppel and Waiver* § 82 (1966). We cannot view the waiver card as a disclaimer of all Vickery's interest in the property. By its own terms, the card was only a consent to default judgment on the original complaint, which, if Garretson had prevailed, would have given Vickery an interest in the property.

1. That the attempted trust fail for indefiniteness and uncertainty.

2. That the said Alice Hollister Lerch being survived by her aunt, Lida Hollister Adams, at the time of her death, October 8, 1951, the said Lida Hollister Adams being her sole heir-at-law and next-of-kin, that the legal title and any beneficial interest to the Phippsburg, *Maine property did vest in fee simple in said Lida Hollister Adams* as the sole heir-at-law and next-of-kin of the said Alice Hollister Lerch under the laws of Descent of the State of Maine. [Emphasis added.]

3. That the Plaintiff may have such other and further relief as the nature of the case may require.

From the complaint, Vickery was on notice that the trust was being challenged on the ground that it failed for indefiniteness and uncertainty and that, if it did fail, the property should be distributed to Adams' estate. The effect would be to distribute the Maine property to the Adams family to share, approximately, as the purported trust would have provided.

Five years later, Garretson completely changed her legal theory and radically shifted the relief requested to her singular benefit. She did not, however, ever amend the complaint on which Vickery and the others presumably had relied in signing the waiver cards. Under this new theory, Garretson now claimed the will did not create a trust because the trust language was merely precatory; Garretson, then, would inherit the property free of trust.

The two theories had radically different effects on Vickery's interests. Under the first theory, Vickery would share a right in the property with the rest of the Adams family, as she had previously under the supposed trust. Under the second theory, Vickery would get nothing. She therefore may well have decided to contest the second theory if she had received notice, even though she had remained passive as to the first. Thus, we conclude that, by ruling that Garretson alone receive the property, free of trust, the Maine court decided an issue outside the scope of the issues with which it was originally presented in the complaint, namely, whether the trust failed for indefiniteness and uncertainty. Furthermore, in awarding Garretson, alone, title to the Maine property, the Maine court granted relief different from that which was requested, namely, that the property vest in fee simple in the estate of Lida Hollister Adams. Vickery did not receive adequate notice "to inform [her] of the issues to be decided" and so was denied an adequate "opportunity to object to any disposition with which [she] did not agree." *Estate of Elias*, 451 A.2d 637, 640 (Me. 1982).[10]

### C.

The trial court ruled that the assets located in the District of Columbia were for the benefit of the Maine property. Giving full faith and credit to the Maine judgment, the court concluded that Garretson owned the Maine property outright and thus was entitled to both the legal and beneficial interests in the Washington, D.C. assets. Because Garretson alone, therefore, owned the legal and beneficial interests in both the Washington, D.C. assets and the Maine property, the trial court held that a merger resulted and that any trust in the Washington, D.C. assets terminated. 2 A. Scott, THE LAW OF TRUSTS § 99 (3d ed. 1967); RESTATEMENT (SECOND) OF TRUSTS § 341 (1959).

The order awarding the Washington, D.C. assets to Garretson presupposed title to the property had been decided by the Maine judgment. Because we conclude the Maine judgment cannot be accorded full faith and credit, legal ownership of the Maine property remains undecided for pur-

---

10. Because we conclude the Maine proceeding deprived appellant of due process of law and is, therefore, subject to collateral attack, we need not address Vickery's additional contention that the court lacked subject matter jurisdiction because a proper party—a successor trustee or a trustee *ad litem*—was not before the court. *Cf. Dillon v. Johnson*, 322 A.2d 332 (Me.1974) (failure to make assessors of towns parties to lawsuit challenging residency requirement deprived court of jurisdiction to decide constitutional issue).

poses of a suit in the District of Columbia over the assets here. Accordingly, we must reverse and remand for further proceedings premised on our conclusion that the Maine judgment is void.

### III.

The trial court ruled that Vickery's counterclaim for Garretson's breach of fiduciary duty failed for four reasons: Vickery was not a beneficiary of the Washington, D.C. assets, which were for the benefit of the Maine property; Garretson could not have breached a fiduciary duty because the Maine property was not held in trust; the claim for breach of trust as to the Maine property was barred by *res judicata;* and, in any event, Vickery's claim was barred by laches. The trial court erred in these rulings.

### A.

Whether there was, in fact, a trust created by the will of Alice Hollister Lerch is irrelevant to a claim of breach of fiduciary duty. The crucial fact is that Garretson held herself out as the trustee of a purported trust and took control of the property. In Maine, "[i]t is firmly settled that if a person has assumed to act as trustee, and having received money in that character, misapplies it, [she] is accountable for the proceeds to the cestui que trust, and cannot defend [ ] by showing that in fact [she] was not legally a trustee, or that when [she] committed the breach [she] did not know who [the] cestui que trust was." *Tarbox v. Tarbox,* 111 Me. 374, 381, 89 A. 194, 198 (1914). Vickery was in fact a beneficiary of a purported trust: Garretson and her attorneys, for twenty years, had consistently represented that Lerch had created a trust for the benefit of the entire Adams family, having a *res* comprised of the Maine property and the Washington, D.C. assets. Garretson held herself out as the trustee. Indeed, in the agreed statement of facts submitted to the Maine court, Garretson stipulated that she "is the executrix and purported trustee under the will of Alice Hollister Lerch" and "has attempted to administer the purported trust since

1952." Garretson and her attorneys continued to regard Vickery as a beneficiary of the trust, even after her mother had written a letter allegedly disclaiming any interest she or her daughter might have in the Maine property. Thus, even if the trust was not legally constituted, Garretson could be held liable under Maine law for breaching a fiduciary duty to Vickery. Vickery, therefore, was also a beneficiary of the assets in the District of Columbia on the premise, accepted by the trial court, that these assets were for the benefit of the Maine property. Moreover, because the Maine judgment is subject to collateral attack, Vickery's claim is not barred by *res judicata. See, e.g., Kremer v. Chemical Const. Corp.,* 456 U.S. 461, 481–82, 102 S.Ct. 1883, 1897–98, 72 L.Ed.2d 262 (1982); *Lewien v. Cohen,* 432 A.2d at 805.

### B.

Finally, we conclude that Vickery's counterclaim is partially barred by laches and partially not barred. The party invoking laches has the burden of proving undue and unexcused delay resulting in prejudice to the party raising the laches defense. *E.g., Schmittinger v. Schmittinger,* 404 A.2d 967, 970 (D.C.1979). One must prove " 'that the party against whom laches is imputed has knowledge of his [or her] rights, and an ample opportunity to establish them in a proper forum.' " *American University Park Citizens Ass'n v. Burka,* 400 A.2d 737, 742 (D.C.1979) (quoting *Galliher v. Cadwell,* 145 U.S. 368, 372, 12 S.Ct. 873, 874, 36 L.Ed. 738 (1892)).

In the trial court's opinion, Vickery had waited 31 years (from 1951 when Lerch died to 1982 when Vickery filed her answer and counterclaim) to assert her claim as a beneficiary. Furthermore, in 1953 Vickery's mother had sent a letter to Garretson's attorney disclaiming any interest she or her family might have in the Maine property. The court found no justifiable excuse for Vickery's failure to bring her claim earlier, suggesting that Vickery should have brought her claim for breach of fiduciary duty when she received notice of the Maine action in which Garretson

repudiated the trust. The court found Vickery's delay had prejudiced Garretson because Garretson was old and retired and the conduct complained of was comprised of actions taken by Garretson's attorneys, Parker Jones and John Carey, both of whom had died. We agree with the trial court that Vickery has presented no excuse for the ten year delay in suing on the original 1972 action attacking the trust. We conclude, however, that, through no fault of her own, Vickery lacked until 1982 the knowledge and opportunity to sue Garretson for claiming the Maine property as her own. Garretson's own conduct obscured the nature of her actions and thus was responsible for Vickery's delay in not bringing the counterclaim until 1982.

In her counterclaim, Vickery did not attempt to have the court declare a trust over the Maine property or the Washington, D.C. assets—an argument she raises only in her affirmative defense against Garretson's claim to the Washington, D.C. assets. Rather, Vickery's counterclaim is that Garretson breached her fiduciary duty as trustee, first, when she attacked the validity of the trust in her original Maine lawsuit in 1972, *see* G. Bogert, THE LAW OF TRUSTS AND TRUSTEES § 581 (Revised 2d ed. 1980) (discussing duty of trustee not to attack the trust), and, second, when Garretson changed legal theories, claimed the property for herself, and failed to inform the beneficiaries of her new position. Vickery's claims, therefore, did not arise during the twenty-one years between Lerch's death and the 1972 suit.

■ Vickery became aware in 1972, when she was served with the complaint in the Maine action, that Garretson was challenging the validity of the trust. Thus, Vickery delayed ten years before suing Garretson over the 1972 lawsuit. Moreover, Vickery fully acquiesced in the original lawsuit; no action of Garretson's lulled Vickery into inaction as to any claim she may have had based on Garretson's original complaint, of which Vickery was well aware. Vickery clearly slept on any rights flowing from the Maine lawsuit as Garretson originally framed it. Because we conclude the trial court's finding of prejudice to Garretson was not clearly erroneous, therefore, we affirm its conclusion that the first element of Vickery's counterclaim is barred by laches. *See Burka,* 400 A.2d at 741 (trial court's determination of prejudice will be affirmed unless clearly erroneous).

Vickery did not become aware of the second alleged breach—Garretson's attempt to take the trust *res* for herself—until 1982, when she was served with the complaint in this action. Any argument that Vickery should have known earlier of the alleged breach suffers from the fact that Garretson's own conduct lulled Vickery and the other family members into inaction. Garretson told them her suit was friendly, designed simply to clear up legal technicalities and to keep the property from reverting to the Town of Phippsburg. The complaint also induced the acquiescence of the remaining family members by requesting only that the property be awarded to Adams' estate, which would leave most of the beneficiaries with approximately the same rights to use the Maine property as those flowing from the purported trust. As a result, Vickery did not discover that Garretson had misrepresented the nature of the Maine action until 1982, when Vickery was served with notice of the District of Columbia lawsuit over the estate assets here.

■ We do not assume that Garretson intended fraudulently to conceal the ultimate nature of the suit she brought under a different theory in 1972. Nor do we assume she consciously failed to notify the rest of the Adams family of her changed legal theory, intending to prevent them from defending their interests. But Garretson and her attorneys did affirmatively induce inaction through the waiver cards. Having been induced into defaulting, the beneficiaries had no duty to stay abreast of the Maine proceedings. They reasonably relied on the original complaint and Garretson's representations; indeed, the Maine rules recognize their right to do so by requiring that amended pleadings be served on parties in default, Me.R.Civ.P. 5(a), and by forbidding the court to grant

relief against a defaulting party beyond that of which he or she has been notified, Me.R.Civ.P. 54(c). If Garretson did breach a fiduciary duty by suing to obtain the property for herself, Vickery cannot be held to have known of the breach until 1982, when she received notice of the Maine judgment. We hold that any delay on Vickery's part was, therefore, excusable, and the doctrine of laches does not apply to bar her counterclaim. *See Burka,* 400 A.2d at 741–42 (citing cases).

*Judgment reversed and remanded for further proceedings consistent with this opinion.*