**Ralph NADER, Appellant,**

v.

**Linda S. SERODY, et al., Appellees.**

**No. 09–CV–906.**

District of Columbia Court of Appeals.

Argued April 21, 2010.

Decided May 10, 2012.

---

See also *In re Nader*, 580 Pa. 134, 860 A.2d 1.

Oliver B. Hall for appellant.

Nathan R. Fennessy, with whom Daniel I. Booker and Douglas K. Spaulding, Washington, DC, were on the brief, for appellees.

Before GLICKMAN and THOMPSON, Associate Judges, and RUIZ, Associate Judge, Retired.[*]

RUIZ, Associate Judge, Retired:

Ralph Nader challenges the trial court's denial of his Rule 60(b) and Rule 41(b) motions to set aside a Pennsylvania judgment that appellees sought to enforce in the District of Columbia. We affirm the judgment of the trial court enforcing the Pennsylvania judgment, as consistent with the principles of the Full Faith and Credit Clause.

## I. Procedural Posture

This case arrived at the doorstep of the Superior Court after a long and convoluted history in the courts of Pennsylvania. Appellees are registered voters in Pennsylvania. They successfully challenged, in the Pennsylvania courts, the validity of signatures on papers nominating appellant Ralph Nader and his running mate, Peter Miguel Camejo, for the 2004 presidential election in Pennsylvania. The Commonwealth Court of Pennsylvania, an appellate court that hears election-related matters, engaged in an extensive review of the nominating papers and, in a lengthy opinion issued on October 13, 2004, concluded that the papers failed to include the re-

quired number of valid signatures.[1] *In re Nader*, 865 A.2d 8, 18 (Pa.Cmwlth.2004). On October 19, 2004, the Supreme Court of Pennsylvania issued a per curiam order affirming the Commonwealth Court's decision, with one justice dissenting. *In re Nader*, 580 Pa. 134, 860 A.2d 1 (2004). The Supreme Court of the United States denied Nader's petition for certiorari. *Nader v. Serody*, 543 U.S. 1052, 125 S.Ct. 884, 160 L.Ed.2d 773 (2005). On October 14, 2004, the Commonwealth Court assessed litigation costs[2] against the Nader–Camejo campaign and the candidates individually, and on January 14, 2005, approved appellees' bill of costs in the amount of $81,102.19. *In re Nader*, 588 Pa. 450, 905 A.2d 450, 455 (2006) (citing Commonwealth Court's two unpublished orders of Oct. 14, 2004, and Jan. 14, 2005, in 568 M.D.2004). On August 22, 2006, the Supreme Court of Pennsylvania affirmed the cost assessment, with two justices dissenting. *Id.* at 460. On January 8, 2007, the Supreme Court of the United States denied Nader's petition for certiorari, *Nader v. Serody*, 549 U.S. 1117, 127 S.Ct. 995, 166 L.Ed.2d 712 (2007), and on April 23, 2007, the Pennsylvania Commonwealth Court entered judgment. It is this judgment that the voters sought to enforce in the District of Columbia, and that Nader resists.

The Pennsylvania judgment was entered on May 16, 2007, in the Superior Court of

---

[*] Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on September 1, 2011.

1. To qualify candidates to be listed as President and Vice–President on the 2004 ballot, the nominating papers required the signatures of 25,697 persons registered to vote in the Commonwealth of Pennsylvania. *In re Nader*, 865 A.2d 8, 18–19 (Pa.Cmwlth.2004). Although the Nader–Camejo papers listed 51,-

273 signatures, the Commonwealth Court determined that only 18,818 of those signatures were valid and authentic and, accordingly, ordered the Secretary of the Commonwealth not to certify the Nader–Camejo ticket for the ballot. *Id.*

2. The litigation costs covered stenographic services, transcript preparation and handwriting-expert witnesses. *In re Nader*, 588 Pa. 450, 905 A.2d 450, 459 (2006).

the District of Columbia as a foreign judgment, pursuant to D.C.Code § 15–352 (2001).[3] On October 25, 2007, Nader's assets in D.C. banks were attached to satisfy the judgment.[4] On October 30, 2007, Nader filed suit in D.C. Superior Court against the Democratic National Committee, various party officials and voters' counsel, Reed Smith, LLP, accusing them of having engaged in "civil conspiracy, malicious prosecution and abuse of process" in connection with their challenges to the Nader–Camejo nomination papers in several states, including Pennsylvania.[5] On November 7, 2007, Nader moved for relief from enforcement of the Pennsylvania judgment, under Rule 60(b), based on what he claimed to be newly discovered evidence of Reed Smith's alleged undisclosed ties and campaign contributions to members of the Supreme Court of Pennsylvania who voted to affirm the judgments against him, see note 15, *infra;* in the alternative, he requested a stay of execution of the judgment in light of the independent action he had just filed. See note 5, *supra.*[6] The following year, on August 1, 2008, Nader petitioned the Pennsylvania Commonwealth Court to open the record or set aside its judgment directing him to pay litigation costs arising from the challenge to his nomination papers in light of criminal charges filed in Pennsylvania related to the challenge,[7] and simultaneously

3. "A copy of any foreign judgment authenticated in accordance with the laws of the District may be filed in the Office of the Clerk of the Superior Court." D.C.Code § 15–352.

4. The voters advised the trial court they had reached a $20,000 settlement with Camejo and, accordingly, sought the judgment award balance from Nader. On July 17, 2007, the Superior Court issued writs of attachment on Nader's banks, and on October 25, 2007, it granted the voters' motion to condemn the funds and issued judgments against the garnishee banks, in favor of the voters, for $34,218.29 from Nader's account at PNC Bank and for $22,710.26 from his account at Amalgamated Bank.

5. *See Nader v. Democratic Nat'l Comm.,* No. 07CA7245. In December 2007, this case was removed to the United States District Court for the District of Columbia, which dismissed the complaint. *Nader v. Democratic Nat'l Comm.,* 555 F.Supp.2d 137, 145 (D.D.C. 2008), *aff'd,* 567 F.3d 692, 694 (D.C.Cir. 2009), *reh'g denied,* 2009 WL 4250599 (D.C.Cir. Jan. 5, 2010).

6. The voters subsequently advised the Superior Court that the U.S. District Court granted their motion to dismiss in May 2008, which the D.C. Circuit affirmed. See note 5, *supra.* Nader's request to stay enforcement of the Superior Court's May 16, 2007, judgment pending resolution of that separate action was, accordingly, rendered moot.

7. Nader's petition was based on the Harrisburg, Pennsylvania Grand Jury's July 10, 2008 Presentment and charges filed by the Pennsylvania Attorney General against twelve individuals for engaging in criminal conspiracy as part of an ongoing investigation into public corruption and criminal misconduct in the Pennsylvania legislature. *In re Nader,* No. 568 M.D.2004 (Pa.Cmwlth. Dec. 4, 2008), at 4–5. The presentment and charges alleged that members and staff of the Pennsylvania House Democratic Caucus had devised a scheme that used public funds, employees, and resources for improper political campaign purposes, including challenging nominating petitions of candidates, such as Nader, who opposed party nominees and Pennsylvania incumbents. *Id.* at 5, 7. The presentment's section entitled, "Nader Petition Challenge" noted that "Nader's presence on the ballot would siphon votes from the [Democratic] Party's Presidential nominee," John Kerry. Nader's petition to the Commonwealth Court argued that the voters' challenge to his nomination papers filed by Reed Smith had been based on the fruits of these illegal activities and that the court's cost judgment should be set aside because otherwise it would "reimburse parties for costs allegedly incurred in connection with criminal misconduct." Nader's petition also "incorporated by reference," "adopt[ed]" and "reassert[ed]" the claims made in his 60(b) motion, which was then pending in D.C. Superior Court.

filed a motion for judicial notice of this petition in D.C. Superior Court. On December 4, 2008, the Pennsylvania Commonwealth Court denied Nader's petition,[8] *In re Nomination Paper Nader,* No. 568 M.D.2004 (Pa.Cmwlth. Dec. 4, 2008), *aff'd, In re Nader,* 603 Pa. 139, 982 A.2d 1220 (2009). On April 16, 2009, Nader filed a motion in Superior Court for restitution of the funds disbursed from his PNC bank account[9] and a Rule 41(b) motion to dismiss the voters' enforcement action for failure to comply with Rule 62(a). On July 21, 2009, after taking judicial notice of the filing (and subsequent denial) of Nader's petition in the Pennsylvania Commonwealth Court to set aside the judgment awarding costs to the voters, the Superior Court denied Nader's 60(b) and 41(b) motions. Nader timely appealed.

## II. Enforcement of Foreign Judgments

■ Article IV § 1 of the Constitution commands that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." Thus, " 'the judgment of a state court should have the same credit, validity, and effect, in every other court of the United States, which it had in the state where it was pronounced.' " *Underwriters Nat'l Assurance Co. v. North Carolina Life and Acc. and Health Ins. Guaranty Ass'n,* 455 U.S. 691, 704, 102 S.Ct. 1357, 71 L.Ed.2d 558 (1982) (quoting *Hampton v. McConnel,* 16 U.S. (3 Wheat.) 234, 235, 4 L.Ed. 378 (1818)). "Pursuant to this [constitutional] provision and in furtherance of federalism and national unity," *Fehr v. McHugh,* 413 A.2d 1285, 1287 (D.C.1980), Congress has mandated that "judgments 'shall have such faith and credit ... in every court within the United States as they have by law or usage in the courts of the State from which they are taken.' " *Id.* (alteration in original) (quoting 28 U.S.C. § 687 (1940)).[10]

We have recognized that, "[u]nder the Full Faith and Credit Clause of the Constitution, a judgment properly authenticated and issued by a court having jurisdiction is entitled to the same degree of recognition in a sister state as would be afforded by the state of original rendition." *Id.* at 1286 (citing, e.g., *Johnson v. Muelberger,* 340 U.S. 581, 71 S.Ct. 474, 95 L.Ed. 552 (1951)). These principles are embodied in the codified law of the District of Columbia. In 1990, the District of Columbia adopted the Uniform Enforcement of Foreign Judgments Act ("UEFJ"), D.C. Law 8–173, D.C.Code § 15–351 *et seq.* (2001), which sets out the procedures and standards for enforcement of foreign judgments in the Superior Court of the District of Columbia.[11] Section 2 of the UEFJ, D.C.Code § 15–352, provides:

**8.** The Commonwealth Court of Pennsylvania reasoned that Nader's petition to open or vacate the judgment relying on alleged criminal misconduct in the pre-challenge review of the nominating papers "is wholly extraneous to the merits of the challenge to Petitioners' nominating papers and the assessing of costs, and the process by which the challenge and cost assessment were decided." *In re Nomination Paper Nader,* No. 568 M.D.2004 (Pa. Cmwlth. Dec. 4, 2008) at 8. The court did not expressly address the claims incorporated from the 60(b) motion.

**9.** No funds were disbursed from Amalgamated Bank.

**10.** Now codified at 28 U.S.C. § 1738 (2006).

**11.** In 1996, the District of Columbia adopted the Uniform Foreign Money–Judgments Recognition Act, D.C. Law 11–84, D.C.Code § 15–381 *et seq.* (2001). This act deals with recognition and enforcement of judgments rendered in other countries. *See* D.C.Code § 15–381 (defining "foreign state").

A foreign judgment filed with the Clerk [of the Superior Court] shall have the same effect and be subject to the same procedures, defenses, or proceedings for reopening, vacating, or staying as a judgment of the Superior Court and may be enforced or satisfied in the same manner.

D.C.Code § 15–352.

■■■ The UEFJ's general purpose is "to obtain uniformity with the rulings of sister state courts." *Carr v. Bett,* 291 Mont. 326, 970 P.2d 1017, 1024 (1998). The Council of the District of Columbia explained that its purpose in adopting the Uniform Act was to "provide an expeditious and simple procedure to enforce foreign judgments in courts of the District of Columbia." Council of the District of Columbia, Committee on the Judiciary, Committee Report on Bill No. 8–56, The Uniform Enforcement of Foreign Judgments Act of 1990 (June 20, 1990), at 2. In adopting the UEFJ, the Council intended to create an efficient mechanism to enforce foreign judgments "upon the mere act of filing," without "the need for another trial," "as if the judgment were a domestic one." *Id.*[12] Section 15–352, however, must be read in harmony with the constitutional mandate to accord full faith and credit to the judgments of sister states. It cannot be interpreted in a manner that subjects foreign judgments to the same range of collateral attack as a judgment of the receiving court; to do so would defeat the purpose of the Full Faith and Credit Clause. Thus, "[t]he rights and defenses preserved by the Act are only those which the debtor may *constitutionally* raise."

*Data Mgmt. Sys., Inc. v. EDP Corp.,* 709 P.2d 377, 381 (Utah 1985) (emphasis added); *see Marworth, Inc. v. McGuire,* 810 P.2d 653, 657 (Colo.1991) ("Most states have interpreted these restrictions to mean that the UEFJA may not create defenses to a foreign judgment that violate the full faith and credit clause."); *Wooster v. Wooster,* 399 N.W.2d 330, 333 (S.D.1987) (noting that "the nature, amount, or other merits of the judgment cannot be relitigated in the state in which enforcement is sought"); *see also Angel v. Bullington,* 330 U.S. 183, 188, 67 S.Ct. 657, 91 L.Ed. 832 (1947); *McKnett v. St. Louis & S.F. Ry. Co.,* 292 U.S. 230, 233, 54 S.Ct. 690, 78 L.Ed. 1227 (1934) ("The power of a state to determine the limits of the jurisdiction of its courts and the character of the controversies which shall be heard in them is, of course, subject to the restrictions imposed by the Federal Constitution.").

■■■ Because the Constitution's Full Faith and Credit Clause "overrides the local regulation of access to the procedures of state courts for the purpose of enforcing foreign adjudications," *Data Mgmt. Sys., Inc.,* 709 P.2d at 381, the language in the UEFJ that calls for applying to foreign judgments the "same procedures, defenses, or proceedings for reopening, vacating or staying" that apply to local judgments, D.C.Code § 15–352 (Section 2 of the UEFJ), must be read narrowly and may not be used to defeat the purposes of the Full Faith and Credit Clause. *Data Mgmt. Sys., Inc.,* 709 P.2d at 381 (noting that allowance of motion under Rule 60(b) pursuant to Section 2 of UEFJ should not

---

12. As the Judiciary Committee stated:

Passage of this bill will permit enforcement of a judgment of another state upon the mere act of filing the judgment in the Office of the Clerk of the Superior Court. The act of filing the foreign judgment gives it the effect of being a judgment of the court in the state in which it is filed, thereby eliminating the need for another trial. The process of enforcement then goes forward as if the judgment were a domestic one.

*Id.*

be "interpreted in a manner which defeats the Full Faith and Credit Clause").

Properly read, section 15–352 recognizes only a limited "caveat" to the application of the Full Faith and Credit clause because "the structure of our Nation as a union of States, each possessing equal sovereign powers, dictates some basic limitations on the full-faith-and-credit principles." *Underwriters Nat'l Assurance Co.*, 455 U.S. at 704, 102 S.Ct. 1357. Thus "[f]ull faith and credit shall be given . . . 'only if the court in the first State had power to pass on the merits—had jurisdiction, that is, to render the judgment.'" *Id.* (quoting *Durfee v. Duke*, 375 U.S. 106, 110, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963)); *see Vickery v. Garretson*, 527 A.2d 293, 299 (D.C.1987). In addition to lack of subject matter and personal jurisdiction of the state rendering the judgment, there are other, limited exceptions to the obligation to give full faith and credit to another state's judgment. We join the consensus of courts in jurisdictions that have adopted the UEFJ and have held that a foreign judgment does not have to be accepted for enforcement in the receiving jurisdiction if the court rendering the judgment lacked jurisdiction or if the foreign judgment resulted from proceedings lacking in essen-

tial due process safeguards or was procured by fraud on the court.[13] *See Jones v. Roach*, 118 Ariz. 146, 575 P.2d 345, 348 (App.1977) (noting that "a sister state need not give full faith and credit to another state's judgments if the rendering state lacked jurisdiction over the person or subject matter, the judgment was obtained through lack of due process, the foreign court was incompetent to render the judgment, the judgment was the result of extrinsic fraud or if the judgment was invalid or unenforceable"); *Carr*, 970 P.2d at 1024 ("[F]raud in the procurement of the judgment, lack of due process, satisfaction, or other grounds that make the judgment invalid or unenforceable may be raised by a party seeking to reopen or vacate a foreign judgment."); *Fungaroli v. Fungaroli*, 53 N.C.App. 270, 280 S.E.2d 787 (1981) (the final judgment of another jurisdiction may be collaterally attacked if it was fraudulently procured); *Schwartz v. Schwartz*, 113 Ohio App. 275, 173 N.E.2d 393 (1960) (stating that where the judgment of a sister state is obtained through fraud, the Full Faith and Credit Clause does not apply). In joining this consensus, we further the UEFJ's purpose "to make uniform the law of jurisdictions that enact it." D.C.Code § 15–357. We now apply

---

**13.** Similar principles apply with respect to the enforcement of judgments rendered by other countries and with respect to the enforcement of state judgments in federal courts. *See Clarkson Co. v. Shaheen*, 544 F.2d 624, 631 (2d Cir.1976) (applying principles of comity and noting, in connection with enforcement of a Canadian judgment, that "[c]lear and convincing evidence of fraud is required in order successfully to attack a foreign judgment, just as such proof is necessary before a court will set aside its own judgment.") (citing *Nederlandsche Handel–Maatschappij, N. V. v. Jay Emm, Inc.*, 301 F.2d 114, 115 (2d Cir.1962)); D.C.Code § 15–381, note 11, *supra*; *Marrese v. American Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985) (noting

that 28 U.S.C. § 1738 requires federal courts to give the same preclusive effect to state court judgments as would be given in the state in which the judgment emerged); *Griffith v. Bank of New York*, 147 F.2d 899, 903 (2d Cir.1945) (recognizing that extrinsic fraud in the procurement of a state court judgment subjects it to collateral attack in federal court); *George v. McClure*, 245 F.Supp.2d 735, 738 (M.D.N.C.2003) (applying law of North Carolina to challenged judgment rendered in that state, where "[a]n independent challenge to a final judgment can be brought to set aside a judgment that is procured by extrinsic fraud or 'fraud upon the court'") (quoting *Scott v. Farmers Coop. Exch., Inc.*, 274 N.C. 179, 161 S.E.2d 473, 476 (1968)).

these principles to the motions filed in this case.

## III. Nader's Challenge to Enforcement of the Pennsylvania Judgment

### A. Rule 60(b) Motion

Nader challenges the denial of his 60(b) motion,[14] contending that the trial court erred in not allowing him to present newly discovered evidence that the Pennsylvania judgment that the voters enforced against him in the District of Columbia was unlawfully procured, and in placing the burden on him to discover facts Reed Smith allegedly concealed.[15] The trial court denied Nader's motion under 60(b)(2) because the evidence Nader proffered was not "newly discovered" as it was publically available before the entry of the cost judgment in Pennsylvania in April 2007 and could have been the subject of a new trial motion in Pennsylvania. The trial court also ruled that Nader was not entitled to relief under Rule 60(b)(3), (4), or (6) because none of Nader's allegations concerning the campaign contributions to the Pennsylvania justices or their failure to recuse raised due process concerns, citing *Caperton v.*

*A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009), or were in violation of Pennsylvania law or applicable ethical rules. Finally, the trial court took judicial notice of Nader's petition to vacate the judgment filed in Pennsylvania and of the denial of that petition.

 Once the foreign judgment was duly filed in Superior Court, *see* D.C.Code § 15–352, note 3, *supra;* Super. Ct. Civ. R. 72,[16] and the court took judicial notice of Nader's challenge to the judgment in Pennsylvania, the Superior Court, as the receiving court, was constitutionally required to defer to the Pennsylvania court's denial of his challenge. Nader's 60(b) motion in D.C. Superior Court challenged the validity of a judgment on the basis of claims that were either fully litigated—and rejected—in the Pennsylvania courts, or that could have been brought in those courts. We recognize that, as discussed earlier, D.C.Code § 15–352 provides that fraud in the procurement of a judgment can be a defense to the enforcement of a foreign judgment. Even if we assume that Nader's claims, if proven, would constitute fraud in the procurement of the cost judgment,[17] however, challenges in the receiv-

14. In *Threatt v. Winston,* we cited, in dictum, cases from other jurisdictions stating that "the proper way to attack a foreign judgment is by filing in the receiving jurisdiction a motion or independent action under Rule 60 (or the local equivalent)." 907 A.2d 780, 788 (D.C.2006). Here, Nader filed both.

15. The trial court's order recognized that Nader alleged newly discovered evidence (1) that Reed Smith made campaign contributions to five of the six Pennsylvania Supreme Court Justices who voted to affirm the award of costs against Nader in the Pennsylvania litigation; (2) that one of the justices had been employed by Reed Smith for three years prior to joining the Pennsylvania Supreme Court in 1994; (3) that Reed Smith represented the Chief Justice of the Supreme Court of Pennsylvania in a state ethics investigation during the pendency of the appeal of Nader's case before the Pennsylvania Supreme Court;

and (4) that there were charges of criminal misconduct in the preparation of the nomination challenge to the Nader–Camejo ticket, as detailed in the Pennsylvania Grand Jury Presentment. The trial court noted that Nader's challenge to the judgment involves allegations of impropriety in connection with affirmance of the cost judgment by the Pennsylvania Supreme Court, and that Nader does not allege any wrongdoing in connection with the original judgment and assessment of costs rendered by the Pennsylvania Commonwealth Court.

16. Nader does not contend that the Pennsylvania judgment was improperly filed, or that he did not receive proper notice.

17. Fraud in the procurement of the judgment, sometimes referred to as "extrinsic fraud" "refers to the manner in which a judgment is

ing court are generally not permitted because of the strong presumption of the validity of a final decision by a sister state which resolved the merits of the controversy. The U.S. Supreme Court has stated that the Full Faith and Credit Clause "generally requires every State to give a judgment at least the res judicata effect which the judgment would be accorded in the State which rendered it." *Durfee,* 375 U.S. at 109, 84 S.Ct. 242. Nader does not contend that the Pennsylvania judgment does not have res judicata effect in that state, and he is now precluded from mounting a second collateral attack under the guise of a 60(b) motion in D.C. Superior Court challenging a foreign judgment. *See Carr v. Rose,* 701 A.2d 1065, 1074 (D.C.1997) (holding that affirmance by the Supreme Court of Pennsylvania precluded claim in District of Columbia that could have been brought against same party in lawsuit filed in Pennsylvania). The same principles of res judicata that bar claims that have been—or could have been—aired and resolved in previous litigation against the same party have even greater force when the litigation has taken place in another state. Anything less would run afoul of the Full Faith and Credit Clause. Nader appropriately sought recourse by filing a petition in the Pennsylvania courts and the Superior Court was bound to defer to that state's final judgment.[18] The Superior Court, accordingly, did not err in denying Nader's 60(b) motion to set aside the Pennsylvania judgments.[19]

### B. Rule 41(b) Motion

██ Nader also challenges the trial court's denial of his 41(b) motion to dismiss the voters' enforcement action and for restitution of the funds disbursed from his PNC bank account. He argues that 1)

---

obtained and concerns matters not directly in issue" in the litigation. *In re Delaney,* 819 A.2d 968, 981 n. 4 (D.C.2003) (distinguishing "intrinsic fraud," which refers to "fraud which arises within the court proceeding," and citing, as an example of extrinsic fraud, "fraud practiced on a party to the proceeding which prevents him or her from presenting a case"); *see also Fidelity Storage Co. v. Urice,* 12 F.2d 143, 145 (D.C.Cir.1926); *Marworth,* 810 P.2d at 657 (distinguishing between two categories of fraud: "extrinsic, which denies a litigant the opportunity to fully litigate his or her rights or defenses upon trial; and intrinsic, which are fraudulent acts pertaining to an issue in the original action or are acts that were, or could have been, litigated in the original action").

18. As noted, Nader's petition to set aside the judgment filed in Pennsylvania incorporated by reference the claims asserted in his 60(b) motion then pending in D.C. Superior Court; the Pennsylvania Commonwealth Court's order denying the petition did not expressly address those claims. See note 8, *supra.* The Superior Court denied the 60(b) motion on July 21, 2009, after the Pennsylvania Commonwealth Court had denied Nader's petition to set aside the judgment, but while that denial was still pending appeal before the Pennsylvania Supreme Court. To the extent that the judgment was not yet final under Pennsylvania law, for purposes of res judicata, until the Pennsylvania Supreme Court ruled, *see Speyer, Inc. v. Goodyear Tire and Rubber Co.,* 222 Pa.Super. 261, 295 A.2d 143, 146 (1972) (for purposes of res judicata "there is only one judgment—the ultimate judgment, which is that of the appellate court"), the Superior Court should have waited for final resolution of the matter in Pennsylvania before entering judgment against the garnishee banks. By the time this appeal came for consideration before this court, however, the Supreme Court of Pennsylvania had affirmed, and any error in entering the judgment earlier was rendered harmless.

19. Because we rely on the preclusive effect of the Pennsylvania judgment, we do not address the merits of Nader's 60(b) motion or review the Superior Court's ruling that the actions of Reed Smith and Pennsylvania Supreme Court justices that Nader argues led to a fraudulently procured judgment, did not violate due process, Pennsylvania law or ethical rules.

Reed Smith violated the automatic stay provision in Superior Court Civil Rule 62(a) by executing on the judgment against the garnishee banks less than ten days from their entry in Superior Court, 2) the 60(b) motion, filed within 10 days of the judgment against the garnishee banks, rendered those judgments non-final, and 3) by failing to oppose Nader's 41(b) motion for restitution of the garnished funds, Reed Smith has not denied involvement in the alleged criminal conspiracy that led to the Pennsylvania cost judgment against Nader that appellees enforced in Superior Court. The same reasoning we have applied for denying Nader's 60(b) motion, also defeats this last point: Nader either has raised, or has had the opportunity to raise, those claims in Pennsylvania; he is precluded from raising them in the District of Columbia. We, therefore, turn to the first two procedural issues, which in essence go to whether appellees' execution on the judgments against the garnishee banks was premature.

Rule 62(a) provides that "no execution shall issue upon a judgment nor shall proceedings be taken for its enforcement until the expiration of 10 days after its entry." Super. Ct. Civ. R. 62(a). Appellees executed on the judgments against the garnishee banks on November 2, 2007. Nader argues this was premature because it was less than ten days after October 25, 2007, when the trial court granted the voters' motion to condemn assets in Nader's bank accounts and issued judgments against the garnishee banks. He also contends that the October 25, 2007 judgments against the garnishee banks were not final because they had been stayed by his November 7, Rule 60(b) motion for relief from judgment.

Nader argues that the trial court erred in two respects: First, because it considered that for purposes of Rule 62(a)'s 10-day period, the judgment being enforced was the one that entered the Pennsylvania judgment on May 16, 2007, whereas he contends the relevant judgments were the two entered against the garnishee banks on October 25, 2007, and, second, because Nader's Rule 60(b) motion rendered the judgment against the garnishee banks non-final.

These arguments are now moot. The purpose of the automatic 10-day grace period is, as Nader argues, to permit the filing of motions for relief from the underlying judgment and to request a stay, pursuant to Rule 62(b), while such motion is pending. The trial court considered and denied Nader's Rule 60(b) motion on the merits, and, as discussed in the previous section, we uphold that denial. Therefore, even if we assume, *arguendo*, that Rule 62(a)'s 10-day period applies to the judgments entered against the garnishee banks, Nader has not been harmed. Moreover, the filing of his Rule 60(b) motion on November 7, 2007, did not affect the finality of the October 25, 2007 judgments against the garnishee banks.[20] There is, therefore, no cause to grant relief on this ground.

For the foregoing reasons, the judgment of the trial court is

*Affirmed.*

---

20. Rule 60(b) states in relevant part, "[a] motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation." Super. Ct. Civ. R. 60. That a Rule 60(b) motion filed within ten days tolls the time for appeal, *see* D.C.App. R. 4(a)(4)(v), does not mean that the underlying order is automatically rendered unenforceable. It is within the trial court's discretion to deny a stay under Rule 62(b).